**In the Interest of A.S., D.S., and L.A.S.**

**No. 14–07–00140–CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

March 4, 2008.

Rehearing Overruled Aug. 26, 2008.

Vangie Deleon, El Campo, William M. Thursland, William B. Connolly, Houston, for appellant.

Sandra D. Hachem, Houston, for appellee.

Panel consists of Justices YATES, FOWLER, and GUZMAN.

## OPINION

WANDA McKEE FOWLER, Justice.

This is an appeal from a judgment terminating appellants' parental rights to their minor children. In five issues each, appellants challenge the legal and factual sufficiency of the evidence underlying the findings in the termination order and the appointment of appellee Department of Family & Protective Services ("the Department") as sole managing conservator. We reverse and render in part, and reverse and remand in part.

## I. Factual and Procedural Background

Veronica is the mother of A.S., D.S., and L.A.S.[1] Alan is the father of A.S. and D.S.[2] On March 10, 2006, a day after the

---

1. To protect the privacy of the parties in this case, we identify the parents by fictitious names, and we identify the children by their initials. *See* TEX. FAM. CODE § 109.002(d).

2. A paternity test revealed that Alan is not the biological father of L.A.S. In its final order, the trial court also terminated the parental rights of L.A.S.'s unknown father.

birth of L.A.S., the Department received information that Veronica and L.A.S. had tested positive for marijuana. The hospital social worker who reported L.A.S.'s positive test result for marijuana to the Department stated that L.A.S. "was doing fine and not showing any signs of health problems." On March 13, 2006, the trial court named the Department as emergency temporary managing conservator of A.S., D.S., and L.A.S. At this time, A.S. was 3 years old, D.S. was 2 years old, and L.A.S. was 3 days old.

Veronica's childhood was traumatic due to domestic violence and her parents' alcohol and drug use. She became pregnant with L.P. when she was 13 years old.[3] After L.P. was born, Veronica met and married Martin De Leon ("De Leon"). Veronica remained married to De Leon for approximately one year during which time De Leon physically abused her. When De Leon tried to harm L.P., Veronica left with L.P. and went to her mother's home. In 2001, she spent three months at a women's shelter where she obtained domestic violence counseling.

In January 2002, Veronica began a relationship with Alan. In October 2002, Veronica gave birth to their son, A.S. In October 2003, their second son, D.S., was born. From 2002 to 2005, Veronica, Alan, L.P., A.S., and D.S. lived together in Beaumont. During this time, three referrals were made to Child Protective Services ("CPS").[4] In April 2003, CPS received a

referral alleging neglectful supervision of L.P. by Veronica and Alan. The report, however, was apparently never validated because the family moved. In July 2004, Alan spanked L.P., who was four years old at the time, for wetting his pants. Though the spanking left no marks or bruises, Veronica went to a shelter with L.P. where she spoke with a police officer and a CPS officer. After this incident, Veronica spoke with Alan about the spanking. Their relationship was not abusive at that time and Alan had never inappropriately disciplined A.S. or D.S.

In 2005, after Veronica and Alan's home in Beaumont was destroyed by Hurricane Rita, the family moved to Houston and stayed with Alan's mother. According to the 4 C's report, Veronica filed a police complaint that Alan had again over-disciplined L.P. The Department investigated the complaint and advised Veronica to move into a shelter. Veronica stayed in a shelter for two or three weeks and only returned home after Alan convinced her that he would never again harm L.P. or any of their children.[5] Veronica later decided to send L.P. to live with his great-aunt in El Campo because the aunt loved L.P. and wanted to care for him, not because she feared that Alan would harm him. During this time, Veronica was pregnant with L.A.S. She saw a gynecologist in Beaumont while pregnant with L.A.S. but was unable to obtain pre-natal care once the family relocated to Houston.[6]

---

3. L.P. is not a subject of this suit.

4. This evidence was presented through a family evaluation report prepared by the Children's Crisis Care Center on April 24, 2006 ("4 C's report").

5. The 4 C's report also reflects that, in February 2006, CPS received a referral alleging physical abuse and neglectful supervision of A.S., D.S., and L.P. by Veronica and Alan. However, the word "Unknown" appears un-

der the box entitled "Validated?," and the Department does not discuss this incident in its brief.

6. The evidence is conflicting as to why Veronica was unable to obtain pre-natal care for L.A.S. in Houston. The 4 C's report reflects that she was unable to get her medical records from Beaumont. However, at trial she testified that no physician was willing to take her as a new patient because of her advanced pregnancy. Notwithstanding, she continued

Veronica testified that Alan pushed her and pulled her hair on two occasions early in their relationship, but she denied that he ever struck her. While it is unclear when these incidents occurred, the record indicates that the children did not witness them. On occasion, she and Alan raised their voices while arguing, and she said it is possible that the children overheard these arguments. The only other evidence of domestic violence was from the Department's case worker, Kateika Bonner ("Bonner"), who testified that Veronica told her that she and Alan had "got[ten] into it one night."

In April 2006, following removal of the children from the family home, the Department prepared a family service plan ("the plan") with a long-term goal of family reunification. Bonner met with Veronica to discuss the steps that she needed to complete to be reunified with her children.[7] Veronica began immediately working toward completion of the requirements. She visited A.S. and D.S. every two weeks and L.A.S. weekly. Bonner testified that the visits went well and that Veronica bonded with all three children during these visits. Veronica wrote often to "her child with whom she had contact." [8] Alan visited his children once but Bonner was unable to observe the visit because she was in a training class at the time.

In June 2006, Veronica and Alan were indicted on charges of aggravated robbery. The Department subsequently placed the children in foster homes.[9] Bonner spoke with several of Veronica and Alan's relatives regarding placement of the children, including Veronica's mother ("Ms. Pena") and Alan's mother. According to Bonner, her supervisor told her that placing the children with Ms. Pena would be problematic because of her criminal history.[10] Placement of the children with the paternal grandmother was not an option because the grandmother's boyfriend did not have a social security number. However, the Department did not conduct a home study on either grandmother to determine whether placement of the children would be otherwise appropriate.

A bench trial was held on January 18, 2007.[11] At the time of trial, the children remained in foster care and no prospective adoptive homes had been identified. In closing arguments, both Veronica's attorney and the guardian ad litem requested that the trial court order the Department to complete a home study on Ms. Pena. The guardian ad litem informed the trial

---

to take pre-natal vitamins throughout her pregnancy.

7. Veronica's plan required that she complete parenting classes, participate in therapy, submit to drug assessments, maintain stable housing and employment, and attend court hearings. Alan's plan required that he submit to paternity testing, inform the case worker of his intentions and desires with respect to permanency of the children, provide documentation demonstrating stable housing and employment, allow access to his home for home study, participate in individual counseling, cease criminal activity, and attend court hearings.

8. We presume that she was referring to her oldest child, L.P., who was being cared for by his great-aunt.

9. During Veronica's incarceration, one of her sisters cared for A.S. and D.S. for approximately one month. However, her sister was unable to continue caring for them because it was creating problems in her marriage.

10. Ms. Pena testified that she had been convicted of forgery in 1978, making a terroristic threat in 1985, and theft by check in or around 1999.

11. Although awaiting trial in the Harris County jail on charges of aggravated robbery, both Veronica and Alan appeared and testified at the termination hearing.

court that she did not believe the Department had met its evidentiary burden supporting termination of Veronica and Alan's parental rights. Upon recessing the proceedings for one week, the trial court directed the Department to conduct a home study on Ms. Pena. However, no home study was ever conducted. On January 25, 2007, the trial court terminated Veronica's parental rights to A.S., D.S., and L.A.S., and Alan's rights to A.S. and D.S. The court also appointed the Department as sole managing conservator of the children.

## II. Standard of Review

◼ Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985). Due to the severity and permanency of the termination of parental rights, the burden of proof at trial is heightened to the clear and convincing standard. *See* Tex. Fam. Code § 161.001; *In re J.F.C.,* 96 S.W.3d 256, 263 (Tex.2002). " 'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam.Code § 101.007; *In re J.F.C.,* 96 S.W.3d at 264.

◼ When reviewing factual findings required to be made by clear and convincing evidence, we apply a standard of review that reflects this burden of proof. *In re S.M.L.,* 171 S.W.3d 472, 476 (Tex.App.-Houston [14th Dist.] 2005, no pet.). When reviewing the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *Id.* (citing *In re J.F.C.,* 96 S.W.3d at 266). In doing so, we assume the factfinder resolved disputed facts in favor of the finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* However, because of the heightened standard, we must also be mindful of any *undisputed* evidence contrary to the finding and consider that evidence in our analysis. *In re J.F.C.,* 96 S.W.3d at 266 ("Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.").

◼ Under a factual sufficiency review, we also must determine whether a factfinder could reasonably form a firm belief or conviction about the truth of the allegations. *In re S.M.L.,* 171 S.W.3d at 476. When reviewing a factual sufficiency challenge, the analysis is somewhat different in that we must consider all of the evidence equally, both disputed and undisputed. *In re J.F.C.,* 96 S.W.3d at 266. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not have reasonably formed a firm belief or conviction, then the evidence is factually insufficient. *In re S.M.L.,* 171 S.W.3d at 476 (citing *In re J.F.C.,* 96 S.W.3d at 266).

## III. Analysis

In order to terminate parental rights in Texas, the State bears the burden to prove the following: (1) the parent committed one or more acts specifically listed in section 161.001(1) of the Texas Family Code as grounds for termination; and (2) termination is in the child's best interest. *See* Tex. Fam.Code § 161.001; *In re J.L.,* 163 S.W.3d 79, 84 (Tex.2005); *In re U.P.,* 105 S.W.3d 222, 229 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). Here, the trial court found that termination was warranted under three separate statutory grounds

and that termination would be in the children's best interest. The trial court also appointed the Department as sole managing conservator of appellants' children. In their first three issues, Veronica and Alan challenge the legal and factual sufficiency of the evidence of the statutory grounds for termination. In their fourth issue, they challenge the legal and factual sufficiency of the evidence that termination is in the children's best interest. In their fifth issue, Veronica and Alan challenge the appointment of the Department as sole managing conservator of their children.

### A. Statutory Grounds for Termination

The Department sought to terminate appellants' parental rights under subsections (D), (E), and (N) of section 161.001 of the Family Code, which provide for termination if the trial court finds by clear and convincing evidence that the parent has done the following:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;
>
> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; [or]
>
> . . . .
>
> (N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months, and:
>
> > (i) the department or authorized agency has made reasonable efforts to return the child to the parent;

> > (ii) the parent has not regularly visited or maintained significant contact with the child; and
> >
> > (iii) the parent has demonstrated an inability to provide the child with a safe environment.

TEX. FAM.CODE § 161.001(1)(D), (E) & (N).

Subsections (D) and (E) both focus on endangerment, but they differ with regard to the source and proof of endangerment. *In re S.M.L.*, 171 S.W.3d at 477. Subsection (D) concerns the child's living environment, rather than the parent's conduct, though parental conduct is certainly relevant to the child's environment. *Id; In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.-Fort Worth 2003, no pet.). Although the parent need not have certain knowledge that an actual injury is occurring, the parent must at least be aware of the potential for danger to the child in such an environment and must have disregarded that risk. *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex.App.-Tyler 2003, no pet.). Living conditions that are merely "less-than-ideal" do not support a finding under this section. *Texas Dep't of Human Svcs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987). Under subsection (E), the cause of the endangerment must be the direct result of the parent's conduct and must be the result of a conscious course of conduct rather than a single act or omission. *In re J.T.G.*, 121 S.W.3d at 125. Endangerment can be exhibited by both actions and failures to act. *In re U.P.*, 105 S.W.3d at 233. We look first at subsection (D).

### 1. Subsection (D)

#### (a) Veronica

In her first issue, Veronica argues that the evidence is legally and factually insufficient to terminate her parental rights under subsection (D) because (1) the Department offered no evidence of the environment in which A.S. and D.S. lived; (2)

she never had custody of L.A.S. and, therefore, could not have exposed him to an environment that endangered his physical or emotional well-being; and (3) the evidence of domestic violence was insufficient to show that she knowingly placed her children in an endangering environment.

The Department introduced no evidence of the actual physical surroundings or conditions of the children's environment. It is also undisputed that the Department took L.A.S. into custody shortly after he was born because he tested positive for marijuana. However, the Department argues that termination is supported by the following evidence: (1) prior to her relationship with Alan, Veronica lived with an abusive husband, thereby exposing her son, L.P., to an abusive environment; (2) Alan pushed Veronica and pulled her hair on two occasions; (3) Alan over-disciplined L.P. twice; and (4) Veronica engaged in criminal activity after the Department took her children into custody.

First, the evidence of domestic violence committed by Veronica's first husband toward Veronica and L.P. does not support the termination of Veronica's parental rights to A.S., D.S., and L.A.S. under subsection (D). The abuse directed toward Veronica and L.P. by her first husband, with whom she no longer lived, occurred before A.S., D.S., and L.A.S. were born, and in a living environment to which they were never exposed.

■ The Department next contends that evidence that Alan pushed Veronica and pulled her hair on two occasions, and over-disciplined L.P. twice, demonstrates that Veronica provided an unsafe home environment. Abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *In re D.C.*, 128 S.W.3d

707, 715 (Tex.App.-Fort Worth 2004, no pet.); *In re C.L.C.*, 119 S.W.3d at 392–93. With regard to Alan's conduct toward Veronica, the evidence was undisputed that the incidents did not occur when the children were around and that the children never witnessed Alan's anger toward her. Regarding the occasions when Alan disciplined L.P., the first instance involved spanking the child after he wet his pants. Veronica testified that the spanking left no marks. The second instance occurred when Alan over-disciplined L.P. due to stress over losing the family home during Hurricane Rita. The record is silent, however, as to how Alan disciplined him or whether A.S. and D.S. witnessed the discipline. Veronica went to a shelter after the first incident and later spoke to Alan about the spanking. Following the second incident, Veronica stayed in a shelter for several weeks and only returned home after Alan assured her that he would never again harm L.P. or any of their children. There is no evidence that any subsequent incidents occurred. Therefore, even assuming Alan's behavior was abusive and occurred in front of the children, Veronica took responsive action to protect A.S. and D.S. by taking them out of the environment.

Third, the Department also asserts that Veronica's actual and alleged criminal activity after her children were taken into custody demonstrates that she placed them in an endangering environment. Specifically, the Department refers to one week in April 2006 during which Veronica was incarcerated for hindering the apprehension of a felon, and to her indictment for aggravated robbery and subsequent incarceration in June 2006.

■ Imprisonment of a parent, standing alone, does not constitute endangerment of a child's emotional or physical well-being. *In re S.M.L.*, 171 S.W.3d at

478. Nonetheless, imprisonment is a factor the trial court may consider. *See Boyd,* 727 S.W.2d at 533; *In re S.M.L.,* 171 S.W.3d at 478. As for her indictment, Veronica had not been convicted of any crime at the time of trial and, therefore, what confinement she might serve, if any, is speculative. *See In re D.T.,* 34 S.W.3d 625, 638–39 (Tex.App.-Fort Worth 2000, pet. denied) (finding appellant's pending charges in other states amounted only to "possibilities" as to her future incarceration).

We find the evidence legally and factually insufficient to support terminating Veronica's parental rights under section 161.001(1)(D) of the Family Code. Accordingly, Veronica's first point of error is sustained.

**(b) Alan**

■ In his first issue, Alan contends that the evidence is legally and factually insufficient to support termination of his parental rights under subsection (D) because the record is silent as to (1) the physical environment in which A.S. and D.S. lived prior to being taken into custody; (2) how the children's environment caused their physical and emotional well-being to be endangered; and (3) his acts or omissions which allegedly placed the children in a dangerous environment.

As previously noted, the Department did not present any evidence of the actual physical surroundings of the children's environment prior to their being taken into custody. In support of a finding under subsection (D), the Department proffered evidence that Alan pushed Veronica and pulled her hair on two occasions and over-disciplined L.P. twice. However, as discussed above, no evidence showed that A.S. and D.S. witnessed any of these events. We do not find such evidence to be of a clear and convincing nature so as to

support a finding of endangerment under subsection (D).

The Department also contends that Alan's criminal activity before and after the births of his children supports termination of his parental rights under subsection (D). Specifically, the Department refers to his probationary status for a burglary offense committed in September 2001 and his indictment on charges of aggravated robbery in June 2006. Several Texas courts have recognized that the possibility of a parent's incarceration can negatively impact a child's living environment and well-being and may be sufficient to show endangerment. *In re S.M.L.,* 171 S.W.3d at 479 ("When parents are incarcerated, they are absent from the child's daily life and are unable to provide support, and when parents like appellant repeatedly commit criminal acts that subject them to the possibility of incarceration, that can negatively impact a child's living environment and emotional well-being."); *In re C.L.C.,* 119 S.W.3d at 393; *In re S.D.,* 980 S.W.2d 758, 763 (Tex.App.-San Antonio 1998, pet. denied). Alan's criminal acts, however, do not support a finding under subsection (D) for several reasons. First, Alan was given probation for his burglary conviction, not imprisonment. Second, as to his indictment on charges of aggravated robbery, although he was incarcerated while awaiting trial on that charge, there was no conviction at the time of the termination hearing and, thus, the length of imprisonment, if any, was speculative. *See In re D.T.,* 34 S.W.3d at 638–39. In the absence of other endangering conduct, Alan's incarceration while awaiting trial is insufficient to support termination under subsection (D). *In re S.M.L.,* 171 S.W.3d at 478 (noting imprisonment, alone, does not suffice to support termination under subsection (D)).

We find the evidence legally insufficient to support the termination of Alan's parental rights under section 161.001(1)(D) of the Family Code. Accordingly, his first issue is sustained.

### 2. Subsection (E)

#### (a) Veronica

■■ In her second issue, Veronica argues that the evidence is legally and factually insufficient to terminate her parental rights under subsection (E) because (1) the evidence of domestic violence is insufficient to demonstrate that she engaged in conduct that endangered her children's well-being; and (2) her use of marijuana while pregnant with L.A.S. does not constitute the requisite continuing course of conduct.

The Department argues that evidence of Veronica's abuse at the hands of her former husband and Alan, in addition to her criminal activity after her children were taken into custody, support termination under subsection (E). Our previous discussion of this evidence under subsection (D) is applicable here. First, the abuse directed toward Veronica and L.P. by her former husband occurred before A.S., D.S., and L.A.S. were born and, therefore, does not demonstrate that Veronica knowingly placed her children with someone whose conduct endangered their well-being. Second, as to the evidence that Alan pushed her and pulled her hair on two occasions, it is uncontroverted that the children did not witness this conduct. Moreover, we do not find that these two incidents, as reflected in this record, constitute the type of continuing course of conduct contemplated by

the statute. Finally, Veronica's incarceration while awaiting trial, standing alone, is insufficient to support termination of parental rights. *In re S.M.L.*, 171 S.W.3d at 478.

■■ The Department also contends that Veronica's use of marijuana during her pregnancy with L.A.S. endangered him as well as her older children because her conduct could have impaired her judgment and exposed her to incarceration. The use of illegal drugs during pregnancy may be considered endangering conduct that supports terminating parental rights. *In re J.T.G.*, 121 S.W.3d at 125. Veronica asserts, however, that a single use of marijuana does not constitute a "voluntary, deliberate, and conscious course of conduct" sufficient to support a termination finding under subsection (E).[12] We agree.

While unquestionably, an exercise of poor judgment, Veronica's use of marijuana on a single occasion, standing alone, does not rise to the level of a conscious course of conduct. *See Ruiz v. Texas Dep't of Family and Protective Svcs.*, 212 S.W.3d 804, 818 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (noting termination under subsection (E) must be based on more than single act or omission); *In re S.M.L.*, 171 S.W.3d at 477 (same); *In re J.T.G.*, 121 S.W.3d at 125 (same). According to the 4 C's report, the hospital social worker who first reported L.A.S.'s positive test result for marijuana to the Department also stated that L.A.S. "was doing fine and not showing any signs of health problems." Further, Veronica testified

---

12. The 4 C's report states that Veronica admitted "to trying marijuana a few times in her life," although it is unclear when those occasions occurred. Moreover, Alan's uncontroverted testimony that he had no knowledge that Veronica had used drugs and that he had never smelled the substance on her suggests that her prior usage occurred before the birth

of her children. In any case, there is no direct evidence that Veronica had an ongoing narcotics problem that would support a finding under this section. *See Ruiz v. Texas Dep't of Family and Protective Svcs.*, 212 S.W.3d 804, 818 (Tex.App.-Houston [1st Dist.] 2006, no pet.).

that she smoked marijuana only in an attempt to alleviate severe back pain and after her friend assured her that it would not harm her unborn child, and that she regretted it afterwards.[13] While the trial court could have chosen to disbelieve this testimony, we are mindful that under a factual sufficiency review we must consider all of the evidence equally. *See In re J.F.C.*, 96 S.W.3d at 266. Moreover, the undisputed evidence that Veronica took pre-natal vitamins during her pregnancy undermines the argument that she consciously engaged in a course of conduct that endangered her children's well-being.

We find the evidence both legally and factually insufficient to support termination of Veronica's parental rights under section 161.001(1)(E) of the Family Code. Accordingly, her second issue is also sustained.

### (b) Alan

■ In his second issue, Alan argues that the evidence is legally and factually insufficient to support termination under subsection (E) because (1) spanking L.P. does not constitute endangering conduct; and (2) he had no knowledge of Veronica's use of marijuana during her pregnancy and, therefore, did not knowingly place his child with someone who engaged in endangering conduct.[14] In support of termi-

nation under subsection (E), the Department argues that Alan's physical abuse of Veronica and L.P. as well as his criminal activity constitute evidence of a course of conduct that endangered the physical and emotional well-being of his children.

As discussed above, we do not find that Alan's conduct toward Veronica, as reflected in this record, constitutes the type of continuing course of conduct required under this section. Furthermore, the undisputed evidence reflects that the children did not witness Alan's conduct. The Department also urges us to consider Bonner's testimony that Veronica told her that she and Alan had "got[ten] into it one night." This conduct, however, does not demonstrate that Alan engaged in conduct that endangered his children's well-being. Bonner admitted on cross-examination that she did not know how Veronica and Alan "got into it," or whether the incident involved a physical altercation. Moreover, this single incident does not demonstrate the type of conduct contemplated by the statute.

The Department also contends that the two occasions when Alan over-disciplined L.P. support the trial court's finding of termination under subsection (E). The Department does not contend, nor does the record reflect, that Alan inappropriate-

---

13. We are unaware of any cases in which a single use of marijuana—or any drug—during pregnancy has, alone, been held sufficient to constitute a "course of conduct" to support termination under subsection (E). *Cf. In re M.D.V.*, No. 14–04–00463–CV, 2005 WL 2787006, at *5 (Tex.App.-Houston [14th Dist.] Oct. 27, 2005, no pet.) (mem.op.) (finding appellant engaged in course of conduct that endangered child in light of her extensive drug use for ten years, particularly while pregnant and while caring for her children, her inability or unwillingness to abstain from drug use after child was born marijuana positive, and her relapse after children were returned to her); *In re S.M.L.D.*, 150 S.W.3d

754, 757–58 (Tex.App.-Amarillo 2004, no pet.) (holding mother's drug use during pregnancy and after child was removed from her care, in face of random drug testing that placed her relationship with child at risk, was legally and factually sufficient evidence that she engaged in course of conduct which endangered her child).

14. The Department does not attempt to argue that Veronica's use of marijuana during her pregnancy is evidence that Alan knowingly placed his children with someone who engaged in endangering conduct. Thus, we need not address this argument.

ly disciplined A.S. or D.S. Rather, it is the Department's position that by excessively disciplining L.P., Alan engaged in conduct that endangered A.S. and D.S.'s well-being. The first incident occurred in 2004 when Alan spanked L.P. after the child wet his pants. Veronica testified that the spanking left no marks and no criminal complaint appears to have been filed. This court has held that infrequent spankings of a child that leave "marks" or visible bruises 24 hours after the spanking do not constitute sufficient evidence to demonstrate that a parent has engaged in conduct that endangered a child's physical or emotional well-being. *In re J.A.J.*, 225 S.W.3d 621, 629–31 (Tex.App.-Houston [14th Dist.] 2006), *aff'd in part, rev'd in part on other grounds*, 243 S.W.3d 611 (Tex.2007). Here, the record shows that Alan spanked L.P. on one occasion, and Veronica testified that the spanking did not leave any marks or bruises. If the spanking would be insufficient evidence of endangering conduct toward L.P., it is similarly insufficient, if not more so, as to A.S. or D.S.

 According to the 4 C's report, the second incident occurred in 2005 when Alan over-disciplined L.P. due to his stress over losing the family home during Hurricane Rita. There is, however, no evidence as to how Alan disciplined him. We also find no evidence to indicate whether A.S. or D.S. witnessed the discipline. Although the decision to terminate the parent-child relationship under subsection (E) does not require that the conduct be directed toward the child, it does require that it be committed in the presence of the child. *See Ziegler v. Tarrant Co. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex.App.-Fort Worth 1984, writ ref'd n.r.e.); *see also In re U.P.*, 105 S.W.3d at 233 (noting that parent's conduct need not be directed at

child or that child actually be injured to support finding of endangerment).

The Department also argues that Alan's probationary status in 2001 and his indictment on charges of aggravated robbery in 2006 constitute conduct sufficient to support termination under this section. We disagree for several reasons. First, Alan was given probation for his burglary conviction, not incarceration. Second, he was indicted on charges of aggravated robbery, not convicted, and, thus, confinement, if any, is speculative. *See In re D.T.*, 34 S.W.3d at 638–39. Third, absent other evidence of endangering conduct, mere imprisonment will not constitute conduct which endangers the emotional or physical well-being of a child. *See Boyd*, 727 S.W.2d at 534.

Finally, we also reject the Department's argument that, by engaging in conduct he knew could result in his imprisonment and separation from his children, Alan engaged in a voluntary, deliberate, and conscious course of conduct that endangered his children. To accept such a premise would effectively nullify the longstanding rule against terminating the parental relationship based solely on imprisonment. *See In re D.T.*, 34 S.W.3d at 635.

We find the evidence legally and factually insufficient to support termination of Alan's parental rights under section 161.001(1)(E). Accordingly, his second issue is sustained.

### 3. Subsection (N)

In their third issue, Veronica and Alan contend that the evidence is legally and factually insufficient to support the termination of parental rights under section 161.001(1)(N) of the Family Code. Under this ground, the Department must prove that (1) the parent has constructively abandoned the child who has been in the permanent or temporary managing conser-

vatorship of the Department or an authorized agency for not less than six months; (2) the department or authorized agency has made reasonable efforts to return the child to the parent; (3) the parent has not regularly visited or maintained significant contact with the child; and (4) the parent has demonstrated an inability to provide the child with a safe environment. TEX. FAM. CODE § 161.001(1)(N). If there is legally insufficient evidence of any of the four elements, the complaint will be sustained. *See In re D.T.,* 34 S.W.3d at 633. Veronica and Alan argue that the Department has failed to satisfy the third and fourth elements of subsection (N). To determine whether termination was warranted under this provision, we turn to the record before us.

### (a) Veronica

■■■ After the Department took her children into custody, Veronica visited A.S. and D.S. every two weeks and L.A.S. weekly until she was jailed in June 2006. Bonner testified that the visits went well and that Veronica was bonding with all three of them during their visits. After she was incarcerated, however, she was no longer able to visit them due to the seriousness of the offense with which she was charged. Veronica testified that she wrote often to her child with whom she had contact. Bonner testified that Veronica did not contact her during her incarceration, and there is no evidence that she had any contact with A.S., D.S., or L.A.S. during the six-month period preceding trial. Veronica provided the Department with a list of her sisters who could care for her children during her incarceration. She also asked that her mother be permitted to care for her children, but the Department would not approve the placement due to Ms. Pena's criminal history. At the conclusion of the proceedings on January 18, 2007, the trial court instructed the Department to perform a home study on the maternal grandmother, but it never conducted one.

In light of the entire record, we do not believe that the Department has satisfied its burden under subsection (N) as to Veronica. We find the evidence factually insufficient to enable a reasonable factfinder to form a firm belief or conviction that Veronica did not regularly visit or maintain significant contact with her children. We also find the evidence to be factually insufficient to show that Veronica demonstrated an inability to provide her children with a safe environment. Although the Department may have been justifiably concerned at the outset as to whether Ms. Pena would prove an appropriate care provider for her grandchildren in light of her criminal history, it conducted no home study on her, even after being directed to do so by the trial court. The record is also silent as to why no home study was performed on the maternal aunts other than the one with whom A.S. and D.S. spent one month. *In re D.S.A.,* 113 S.W.3d 567, 573 (Tex.App.-Amarillo 2003, no pet.) (noting that incarcerated parent can provide safe environment for child through identification of friend, relative, or spouse as care provider). The Department had the burden to satisfy all of the elements under subsection (N) by clear and convincing evidence. We conclude that it has not done so. Accordingly, Veronica's third issue is sustained.

### (b) Alan

■■■ Regarding Alan, the record reflects that during the three-month period between the time the Department took custody of his children in March 2006 until he was incarcerated in June 2006, Alan visited his children only once. Bonner testified that she was in a training session during this one visit and was unable to observe Alan's interaction with his children. She also testified that Alan's brother came often to visit the children. No

evidence indicates whether Alan made any attempts to communicate with his children after he was incarcerated. Bonner testified that she spoke with Alan's mother and sister regarding alternative placement of the children. The Department ruled out Alan's mother after she was unable to provide a social security number for her boyfriend, and it did not conduct a home study on her. The record is silent as to whether Alan's sister or brother were considered for placement.

We find the evidence sufficient to support the trial court's finding that Alan did not attempt to visit his children regularly or maintain significant contact with them. Other than one visit during the three-month period after they were placed in the Department's custody and before he was incarcerated, the record does not reflect any other attempt by Alan to contact them. We find that the Department has satisfied its burden with regard to the third element.

However, we do not believe the Department has met its burden for the fourth element—that the parent has demonstrated an inability to provide the child with a safe environment. Although Bonner spoke with Alan's sister about placing the children with her, the record does not reflect whether the Department rejected her as a potential placement and, if so, why. There is also no mention whether the Department considered Alan's brother as a relative placement. Further, although the Department initially ruled out the paternal grandmother because she did not provide the Department with a social security number for her boyfriend, no follow-up or home study appears to have been done to determine whether she was an otherwise appropriate relative to care for the children. The Department asserts that Alan

"did not suggest that he could do anything to provide the children with a safe environment." However, as the party seeking the termination of parental rights, the Department bears the burden of proof under section 161.001(1)(N) to show that he was unable to do so. See In re D.T., 34 S.W.3d at 641 (noting caseworker's statement at trial that appellant had not shown she could provide safe, stable home for child improperly reversed burden of proof).

We find the evidence factually insufficient to support termination of Alan's parental rights under section 161.001(1)(N) of the Family Code. Accordingly, Alan's third issue is sustained.[15]

## B. Sole Managing Conservatorship

■ In their fifth issue, Veronica and Alan contend that, if we reverse that portion of the trial court's order terminating their parental rights, we must also reverse the portion appointing the Department as sole managing conservator of the children. This is so, they argue, because the trial court's conservatorship appointment was a direct consequence of the termination of their parental rights, and, therefore, reversal of the termination of their parental rights necessitates reversal of the appointment of the Department as sole managing conservator. The Department, however, contends that we are precluded from considering this issue because appellants did not include it in their statement of appellate points presented to the trial court pursuant to Texas Family Code section 263.405. See TEX. FAM. CODE § 263.405(b). In the alternative, the Department argues that the trial court's conservatorship appointment was based on a ground independent from its decision to terminate appellants' parental rights and, therefore, should be upheld.

15. Having found the evidence insufficient under section 161.001(1)(D), (E), and (N), we need not address appellants' fourth issue challenging the trial court's conclusion that termination was in the children's best interest.

The Texas Supreme Court recently issued two decisions that bear directly on our disposition of this issue. In *In re J.A.J.*, 243 S.W.3d 611 (Tex.2007), the Court resolved a split among appellate courts regarding whether it is necessary to specifically assign error to the Department's appointment as conservator when a judgment terminating parental rights is reversed. *Id.* at 613–14. In that case, the Department sought termination of the mother's parental rights to her child and requested conservatorship pursuant to sections 153.005 and 153.131. *Id.* at 612–13.[16] The trial court terminated the mother's parental rights and appointed the Department the child's sole managing conservator. *Id.*

On appeal, the mother claimed that the evidence was insufficient to support the termination decision, but she did not assign error to the conservatorship appointment. *Id.* The court of appeals determined that the evidence was insufficient to support termination under Texas Family Code section 161.001(1)(D) and (E) and reversed the trial court's judgment, including that portion appointing the Department as the child's conservator. *Id.*

In its petition for review, the Department challenged only the portion of the court of appeals' judgment that reversed its appointment as the child's managing conservator. *Id.* at 613–14 In its analysis, the Court noted that the trial court found that (1) appointment of the parent as conservator would not be in the child's best interest because it would significantly impair his physical health or emotional development, and (2) appointment of the De-

partment as managing conservator was in the child's best interest. *Id.* at 614–15. The Court concluded that "[t]hese findings satisfy not only the fundamental requirement that the court consider the best interest of the child, ... but also the more specific findings necessary to justify the Department's appointment under section 153.131." *Id.* In light of the differing elements and standards of review applied to conservatorship ` and termination orders, the Court concluded that a challenge to the Department's appointment as the child's conservator was not subsumed in the appellant's challenge to the termination order. *Id.* In the absence of assigned error, the Court reversed the portion of the court of appeals' judgment that reversed appointment of the Department as the child's sole managing conservator. *Id.* at 617.

In *In re D.N.C.*, 252 S.W.3d 317, (Tex. 2008) (per curiam), the Court considered a similar challenge to a court of appeals' reversal of a trial court's conservatorship order. In the case reviewed in *D.N.C.*, styled below as *Colbert v. Department of Family & Protective Services*, the Department sought termination of the mother's parental rights to her seven children. *See* 227 S.W.3d 799, 802 (Tex.App.-Houston [1st Dist.] 2006), *pet. denied, In re D.N.C.*, 252 S.W.3d 317 (Tex.2008). The trial court found that the mother had endangered her children and terminated her parental rights under section 161.001(1)(D). *Id.* at 807. Without making any additional findings, the trial court appointed the Department as the children's managing conservator. *Id.*

On appeal, the mother challenged the sufficiency of the evidence supporting the

---

**16.** Section 153.005 provides generally that in a suit affecting the parent-child relationship, "the court may appoint a sole managing conservator or may appoint joint managing conservators." TEX. FAM. CODE § 153.005. Section 153.131 creates a rebuttable presumption that a parent should be appointed

the child's managing conservator "unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development." *Id.* § 153.131(a).

termination order, but she did not separately challenge the appointment of the Department as the children's managing conservator. *Id.* The court of appeals reversed the termination order on factual insufficiency grounds and reversed the conservatorship appointment. *Id.* at 816. Reasoning that no findings had been made under Family Code section 153.131 that would independently support the conservatorship order, the appeals court concluded that the Department's appointment was solely the consequence of the trial court's termination decision under section 161.207 and had to be reversed as well. *Id.*[17]

In a per curiam decision, the Court addressed the Department's argument that reversal of the conservatorship order was erroneous in light of its recent decision in *J.A.J. In re D.N.C.*, 252 S.W.3d at 318. The Court emphasized that while the Department in *J.A.J.* had requested conservatorship pursuant to Family Code section 153.131 and the trial court had made the specific findings the statute requires—*i.e.*, that appointment of a parent as managing conservator would not be in the child's best interest because it would significantly impair his physical health or emotional development, and that appointment of the Department was in the child's best interest—the only available statutory mechanism for the Department's appointment in the instant case was as a consequence of the termination pursuant to Family Code section 161.207. *Id.* at 318. It therefore concluded that *J.A.J.* did not apply, and that the mother's challenge to the conservatorship appointment was subsumed in her appeal of the termination order. *Id.* With these guidelines in mind, we consider Veronica and Alan's challenge to the ap-

pointment of the Department as sole managing conservator of A.S., D.S., and L.A.S.

On March 13, 2006, the Department filed its "Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent–Child Relationship." In section 13 of the complaint, the Department requested that it be appointed the children's sole managing conservator "[p]ursuant to §§ 153.005 and 263.404." It further stated that "[a]s grounds for appointment of the Department ... as Managing Conservator, the Department alleges pursuant to § 153.131 of the Texas Family Code that the appointment of the parent or parents would not be in the best interest of the children because the appointment of the parent or parents would significantly impair the children's physical health or emotional development." In its Final Decree for Termination, under the section entitled "Conservatorship of the Children," the trial court ordered that the Department be appointed sole managing conservator of A.S., D.S., and L.A.S. and found "this appointment to be in the best interest of the children." No additional findings were made.

Because the trial court made no findings under section 153.131 that would independently support the conservatorship order, we conclude that the Department's appointment was solely the consequence of the trial court's termination decision under Family Code section 161.001(1).[18] In accordance with *D.N.C.*, we conclude that Veronica and Alan's challenge to the conservatorship appointment was subsumed in their appeal of the termination order. Because we reverse the portion of the trial court's order terminating Veronica and Alan's parental rights under section

---

**17.** Section 161.207 provides that the court shall appoint a suitable managing conservator "[i]f the court terminates the parent-child relationship with respect to both parents or to

the only living parent." TEX. FAM. CODE § 161.207(a).

**18.** We note that while the Department in *D.N.C.* did not request conservatorship under

161.001(1), we also reverse the portion of the order that appointed the Department as the sole managing conservator. We sustain appellants' fifth issue.

## IV. Conclusion

Accordingly, we reverse that portion of the trial court's decree terminating Veronica's parental rights to A.S., D.S., and L.A.S., and render judgment denying the Department's request to terminate Veronica's rights to A.S., D.S., and L.A.S. We reverse that portion of the decree terminating Alan's parental rights to A.S. and D.S., and render judgment denying the Department's request to terminate Alan's rights to A.S. and D.S. In addition, because it was not supported by findings separate and apart from the findings supporting the termination, we also reverse that portion of the decree appointing the Department as the sole managing conservator of A.S., D.S., and L.A.S., and remand the case to the trial court for the limited

purpose of rendering an order, consistent with Family Code section 161.205.[19]

section 153.131, the Department in this case did make such a request. The Department relies on this fact to argue that although the trial court did not specify the statutory basis on which it relied to appoint the Department as conservator, or issue any findings of fact, we may nonetheless infer that the court made the necessary findings to support the conservatorship appointment under section 153.131. We disagree. In *J.A.J.*, the Court emphasized that the trial court's specific finding that appointment of a parent as the child's conservator would not be in his best interest because it would significantly impair his health or emotional development was necessary to justify the Department's appointment under section 153.131. 243 S.W.3d at 614–15. In the absence of such a finding by the trial court here, we will not infer one.

19. When reversing the trial court's judgment or appealable order, we ordinarily render the judgment or order that the trial court should have rendered. *See* TEX. R. APP. P. 43.3; *Colbert*, 227 S.W.3d at 816. However, in a case involving the involuntary termination of parental rights, if the trial court does not order termination of the parent-child relationship (which becomes the case here because

we have reversed the trial court order and have rendered judgment that appellants' parental rights are not terminated), Family Code section 161.205 requires that the trial court either (1) deny the petition for termination, or (2) render any order in the best interest of the child. *See* TEX. FAM. CODE § 161.205. As an appellate court, we are not in a position to determine whether to simply deny the petition for termination or to render some other order in the best interest of the child. *Colbert*, 227 S.W.3d at 816. Circumstances concerning the child or parent may have changed since the trial court rendered its final order, a matter that requires a factfinder. *Id.* We are therefore unable to render a judgment that disposes of all remaining issues in the case and must remand the case in part to the trial court for further proceedings under section 161.205. *See id.* & n. 15 ("[S]ection 161.205 becomes applicable on remand because we have reversed the trial court order and have rendered judgment that appellant's parental rights are not terminated. Section 161.205 is the controlling authority for how the trial court must proceed on remand.").