**Affirmed and Memorandum Opinion filed March 27, 2012.**



In The

# 𝕱𝖔𝖚𝖗𝖙𝖊𝖊𝖓𝖙𝖍 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

### NO. 14-11-00926-CV

## IN THE INTEREST OF A.W.B., A CHILD

**On Appeal from the 315th District Court
Harris County, Texas
Trial Court Cause No. 2009-07340J**

## MEMORANDUM OPINION

After a bench trial, the trial court signed a decree terminating Mother's parental rights to her biological child, A.W.B., and appointing the Department of Family and Protective Services as the sole managing conservator of A.W.B.[1]  In five issues, Mother argues that the evidence is legally and factually insufficient to support the trial court's findings related to termination of her parental rights and the Department's conservatorship of A.W.B.  We affirm.

### TERMINATION OF MOTHER'S PARENTAL RIGHTS

Parental rights may be terminated only upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by Section 161.001(1) of the

---

[1] The trial court also terminated the parental rights of an unknown father.

Texas Family Code; and (2) termination is in the best interest of the child. *In re C.W., Jr.*, No. 14-09-00306-CV, 2009 WL 4694946, at *5 (Tex. App.—Houston [14th Dist.] Dec. 10, 2009, no pet.); *see* Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2011).

In this case, the trial court found by clear and convincing evidence that termination of the parent-child relationship between Mother and A.W.B. was in A.W.B.'s best interest and that Mother committed acts prohibited by three separate subsections of Section 161.001(1):

- She knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. *See* Tex. Fam. Code Ann. § 161.001(1)(D).

- She engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. *See id.* § 161.001(1)(E).

- She failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child. *See id.* § 161.001(1)(O).

In her first three issues, Mother argues that the evidence is legally and factually insufficient to support the Section 161.001(1) findings; in her fourth issue, she argues that the evidence is legally and factually insufficient to support the best interest finding. We hold that the evidence is legally and factually sufficient to support the trial court's Section 161.001(1)(O) and best interest findings.[2]

## I.     Standards of Review

Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be

---

[2] Because there is sufficient evidence to support the trial court's Section 161.001(1)(O) finding, we need not address the Section 161.001(1)(D) and (E) findings. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

established." Tex. Fam. Code Ann. § 101.007 (Vernon 2008). In reviewing legal sufficiency in a parental termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.* In reviewing factual sufficiency, we consider and weigh all of the evidence, including disputed or conflicting evidence. *Id.* at 345. If the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm believe or conviction, then the evidence is factually insufficient. *Id.*

## II.     Trial Court's Section 161.001(1)(O) Finding

Mother contends that the evidence is legally and factually insufficient because (1) A.W.B. was not removed from Mother's custody "for the abuse or neglect of the child;" and (2) the trial record does not contain a court order establishing the actions necessary for Mother to obtain the return of A.W.B.

### A.     Removal for Abuse or Neglect

Mother argues there is no evidence to show that A.W.B. was removed due to abuse or neglect because the child was brought into the Department's care due to a breakdown in Mother's voluntary placement of A.W.B. with Mother's friend, Tanya Fisher. Further, one of the Department's investigators stated that while A.W.B. was in Mother's care, A.W.B. was well-dressed and appropriate for school, very clean, and appeared to be very healthy and developmentally on target. The investigator "had no concerns for [A.W.B.]'s safety at that time."

The record contains the trial court's October 26, 2009 "temporary order following adversary hearing . . . pursuant to § 262.201 or 262.205, Texas Family Code," which appointed the Department the temporary managing conservatory of A.W.B. and included

3

the findings required by Section 262.201 of the Family Code. *See* Tex. Fam. Code Ann. 262.201(b) (Vernon Supp. 2011). This document is evidence that A.W.B. was removed from Mother "under Chapter 262 for the abuse or neglect of the child," as the trial court found in the decree for termination.[3]

Further, as Mother acknowledges on appeal, the investigator was reviewing A.W.B's condition because "there was an allegation of physical abuse of the child by Mother." The family service plan, which was admitted as an exhibit at trial, explains that the reason for the Department's involvement was that a referral was made to the Department alleging physical abuse of A.W.B. "It was alleged that the mother . . . was hitting [A.W.B.] in the face, back and arm for touching a 'pipe.'" Mother allegedly grabbed A.W.B. again and "started to 'beat' her." *See In re S.N.*, 287 S.W.3d 183, 190 & n.2 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (sufficient evidence based on statements in family service plan and trial court's findings made pursuant to Chapter 262). The 4C's family evaluation, also admitted as an exhibit at trial, contains substantially the same facts; it also notes the offense date was September 23, 2009, less than a month before the trial court's Chapter 262 order. *See In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at \*14, \*16 (Tex. App.—Houston [14th Dist.] Jan. 19, 2012, no pet.) (mem. op.) (sufficient evidence based on statements in 4C's report; noting trial court made the requisite findings under Chapter 262 after an adversary hearing).

Accordingly, there is legally and factually sufficient evidence to support the trial court's finding that A.W.B. was removed for abuse or neglect.

## B. Court Order Establishing Actions Necessary for Return of A.W.B.

Mother acknowledges that the trial court admitted into evidence Mother's family service plan, but the Department "never offered into evidence any court order which

---

[3] We view the court's order as evidence on this point for the same reason we view it as evidence supporting the finding that Mother failed to comply with the court's order, discussed in the next section of this opinion.

ordered Mother to complete her service plan."[4]  Relying on *In re C.L.*, 304 S.W.3d 512, 517 (Tex. App.—Waco 2009, no pet.), Mother argues that there is no evidence of a court order setting forth the actions necessary to obtain the return of A.W.B. because the trial court did not announce that it was taking judicial notice of any of its prior orders in its file.

In *In re C.L.*, the Waco Court of Appeals held that there was no evidence that (1) the children were removed because of abuse or neglect; (2) the Department had been the managing conservator of the children for nine months; or (3) the service plan was incorporated in a court order that specifically established the actions necessary for the mother to obtain the return of the children.  *Id.* at 517.  The court reasoned that it could not consider evidence from the trial court's file when the trial court never explicitly stated it was taking judicial notice of the file or orders.  *Id.* at 516.  The court explained that it would not consider any orders found in the record because this use of judicial notice would offend due process.  *See id.* at 516 & n.4.

However, this court has consistently taken a different view of judicial notice on a silent record.  For example, we have held that "we may presume that the trial court took such judicial notice of the record without any request being made and without any announcement that it has done so."  *Marble Slab Creamery, Inc. v. Wesic, Inc.*, 823 S.W.2d 436, 439 (Tex. App.—Houston [14th Dist.] 1992, no pet.).  More recently, we stated a "trial court is presumed to judicially know what has previously taken place in the case tried before it, and the parties are not required to prove facts that the trial court judicially knows."  *In re J.J.C.*, 302 S.W.3d 436, 446 (Tex. App.—Houston [14th Dist.]

---

[4] When a court signs an order appointing the Department as a temporary managing conservator under Chapter 262, as the trial court did here, the Department must file a service plan with the court.  *See* Tex. Fam. Code Ann. § 263.101 (Vernon 2008).  A service plan must, among other things, (1) be specific; (2) state the goal of the plan, which may be the return of the child to the child's parents; and (3) state the actions and responsibilities necessary for the child's parents to take to achieve the plan goal.  *See* Tex. Fam. Code Ann. § 263.102 (Vernon 2008).  The trial court "shall incorporate the original and any amended service plan into the orders of the court."  Tex. Fam. Code Ann. § 263.106 (Vernon Supp. 2011) (effective Sept. 1, 2011).

2009, pet. denied); *see also In re A.X.A.*, No. 04-09-00519-CV, 2009 WL 5150068, at *4 n.3 (Tex. App.—San Antonio Dec. 30, 2009, no pet.) (mem. op.) (citing *Marble Slab Creamery*, 823 S.W.2d at 439) (presuming that the trial court took judicial notice of the family service plan and the order adopting the plan; both documents were in the clerk's record); *In re S.M.*, No. 04-04-00194-CV, 2005 WL 418540, at *4 (Tex. App.—San Antonio Feb. 23, 2005, no pet.) (mem. op.) (rejecting the "technical argument" that there was no evidence of the parent's failure to comply with the trial court's order when the family service plan was admitted as an exhibit and the clerk's record contained the trial court's order).  Here, the same judge who signed the order following an adversary hearing under Chapter 262 signed the decree for termination.  The judge did not explicitly state that he was taking judicial notice of the Chapter 262 order, which is contained in the clerk's record on appeal and orders Mother "to comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit."  However, following our precedent, we presume that the judge took judicial notice.

Regardless of whether we presume judicial notice of the trial court's order, the record contains sufficient testimonial evidence.  Mother knew what was required by the family service plan, and she understood her failure to comply was a ground for termination of her parental rights.  She testified as follows:

Q:   Did you receive a Family Plan of Service in this case?
A:   Yes.
Q:   And this isn't your first CPS case, correct?
A:   Yes.
Q:   So you've had other Family Plans of Service in the past, haven't you?
A:   Yes.

         *                  *                 *

Q:   And your lawyer — you had a chance to discuss this service plan and the things you need to do, correct?

6

A: Yes.

Q: Do you think you knew what you were being asked to do in order to get your daughter back?

A: Yes, sir.

Q: And you would agree with me that you haven't done that?

A: I've done everything except for one thing.

Q: And would you agree with me that the therapy that you didn't complete was a pretty important thing?

A: Yeah, it was.

*    *    *

Q: I heard you testify to Mr. Kundiger that you did 99 percent of your services — do you understand this Court can terminate you on the ground that you did not successfully complete all of your services?

A: Yes, I understand that.

The Department's caseworker Sandy Porter also testified that Mother failed to complete her required therapy, which "was court ordered." Mother testified that she failed to complete the therapy required by the family service plan. *See In re M.C.G.*, 329 S.W.3d 674, 675–76 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (appeal was frivolous because of undisputed fact that the parent failed to undergo individual therapy as required by the service plan, thus providing a basis for termination of the parent-child relationship).

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that Mother failed to comply with the provisions of a court order that specifically established the actions necessary for Mother to obtain the return of A.W.B.

## III. Trial Court's Best Interest Finding

Relying on the nonexclusive factors identified in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976), Mother argues there is insufficient evidence to support the trial court's finding that termination was in A.W.B.'s best interest. *See* Tex. Fam. Code Ann.

7

§ 161.001(2). To determine the best interest of a child in such a case, courts may consider the *Holley* factors,[5] statutory factors under Section 263.307 of the Texas Family Code,[6] and any other relevant information. *See In re J.C.C.*, 302 S.W.3d at 447–48.

A.W.B. was born on October 27, 2006, and the termination trial was held on September 12, 2011 when A.W.B. was almost five years old. Mother had a history with the Department concerning her seven other children, none of whom were in her custody at the time A.W.B. was born. Her rights to some of the children were terminated, and she relinquished her rights to others. She testified that she lost her rights to five of the children because of her drug use — specifically, cocaine. She testified, "I haven't used nothing in four years," essentially admitting to drug use after A.W.B. was born. The

---

[5] These factors include (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody in promoting the best interest of the child; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *In re J.C.C.*, 302 S.W.3d at 448 (citing *Holley*, 544 S.W.2d at 371–72).

[6] These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. *In re J.C.C.*, 302 S.W.3d at 447–48 (citing Tex. Fam. Code Ann. § 263.307(b) (Vernon 2008)).

4C's evaluation notes that Mother had several "validated" referrals to the Department based on physical abuse and neglect of her other children.

Mother had a difficult adolescence after she discovered that she was adopted and met her biological mother, whose husband at the time repeatedly made Mother perform oral sex on him when she was a preteen or young teenager. She "quit school" after the tenth grade, and her adoptive parents "took her to CPS when she was 16 years old and she was in custody of CPS." She was in a group home for the mentally challenged and eventually was placed in a "lock-down facility" until she was 18 years old.

Mother was "introduced to exotic dancing, prostitution, and cocaine when she was 18 years old." While Mother was pregnant with A.W.B., she was arrested and served jail time on three occasions — all for prostitution. The final arrest and conviction occurred in September 2006. After A.W.B. was born, Mother also served four months in jail on a forgery conviction. While in jail, Mother placed A.W.B. with Shamayra Brown. Porter testified that Brown had an ongoing case with the Department due to physical neglect of her own children.

Since A.W.B. was born, Mother moved residences about 10 or 11 times. Project Life Road "kicked [her] out . . . because [she] got into it with a faggot." When the Department began investigating the abuse allegations regarding A.W.B., Mother was living with someone named "Maria," but Mother did not know Maria's last name. Mother testified, however, that she had been living in the same apartment complex for two years at the time of trial. She paid about $115 per month in rent out of her monthly income of about $700. Her income is from Social Security and Medicaid. She had not been employed for about two years at the time of trial. She testified that she tried to find work, but her forgery conviction caused employers to not hire her. Her last employer fired her because she missed too many days of work, though she testified that she had notes from doctors to explain her absences. Her supervisor said she was a "no call, no show."

9

Mother is bipolar and testified that she takes Propranol: "I take it — one to two tablets at nighttime." Porter testified that she did not believe Mother was taking medications prescribed to her by a psychiatric evaluator because Mother told Porter that "it was affecting her with the other medications that she was taking and that she had stopped taking it." Mother testified that she attended AA and NA classes, but Porter testified that Mother never provided the Department with her sign-in sheets as the Department requested.[7] Mother acknowledged that she did not do psychiatric therapy as required by her family service plan. She understood that failure to do the therapy could result in termination of the parent-child relationship. She said she did not continue sessions with her first therapist because she "didn't agree with what she wrote." She did not go to another therapist because she lost her bus pass and could not afford the fare. She testified, however, that she thought she had enough income to provide for A.W.B.

Porter testified that Mother took multiple drug tests and did not test positive. Mother had stable housing for over a year, and she was looking for work. She phoned A.W.B. "at least weekly or two weeks." Mother also completed parenting classes required by the service plan, and she was taking classes to earn her GED. Porter explained, however, that the Department was concerned about Mother's lack of employment, lack of transportation, low income, lack of a plan for A.W.B., and Mother's failure to complete her service plan, including her failure to attend therapy and document her NA and AA meetings. Mother's history with the Department, drug abuse, and criminal conduct also concerned the Department.

Porter testified further that A.W.B. had no special needs, no behavioral issues, and no learning disabilities. Porter believed A.W.B. could be adopted, and the Department's plan for A.W.B. was foster care followed by an unrelated adoption. At the time of trial, A.W.B. was living with Mother's sister in Pennsylvania. The sister was not willing to keep A.W.B. any longer. Mother testified that A.W.B. wanted to come back to Texas,

---

[7] Mother testified she was never asked to provide such documentation.

"[w]ith my sister . . . and her husband when they move down here." Finally, Mother testified that she wanted A.W.B. to be placed with Mother's sister:

> Q. Now, bottom line, do you think you would agree that there are other placements that are in a better position than you to properly raise [A.W.B.]?
>
> A. My sister's.
>
> Q. And is that what you would like to see?
>
> A. Yeah, not no foster parent.

Considering all of this evidence, there is legally and factually sufficient evidence that termination was in A.W.B.'s best interest. There is significant evidence supporting termination based on the factors identified above. In particular, returning A.W.B. to Mother's care could result in emotional and physical danger in light of Mother's past abusive and neglectful conduct regarding her other seven children, the report of abuse of A.W.B., Mother's admitted use of cocaine despite the fact that she cited cocaine as the cause of losing her other children, Mother's bipolar disorder and lack of appropriate treatment, and Mother's criminal history, which resulted in her separation from A.W.B. for four months and placement of A.W.B. in a home where children were allegedly neglected. A.W.B.'s time with Mother was unstable due to Mother's frequent moves. The Department believed A.W.B. could be adopted due to her lack of special needs, which would provide more stability. Mother failed to complete psychiatric therapy on several occasions and knew that her failure to do so could result in termination of the parent-child relationship.

Mother had a significant substance abuse problem, and although she was making progress, she failed to document her attendance at NA and AA meetings. Both A.W.B. and Mother stated they wanted A.W.B. to live with Mother's sister, but Mother's sister was not willing to assist Mother by caring for A.W.B. any longer. Thus, Mother did not have family support to assist caring for A.W.B. Although Mother completed parenting

classes, the evidence supports a determination that she did not demonstrate adequate parenting skills.

Accordingly, Mother's first, second, third, and fourth issues are overruled.

### APPOINTMENT OF THE DEPARTMENT AS SOLE MANAGING CONSERVATOR

In her fifth issue, Mother argues that the evidence was legally and factually insufficient to support the trial court's finding that appointment of Mother as managing conservator would not be in A.W.B.'s best interest because the appointment would significantly impair the child's physical health or emotional development. *See* Tex. Fam. Code Ann. § 153.131(a) (Vernon 2008) ("[U]nless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator . . . .").

A parent is required to independently challenge a trial court's finding under Section 153.131(a) to obtain reversal of the conservatorship appointment if the appellate court reverses a trial court's termination of the parent-child relationship. *See In re J.A.J.*, 243 S.W.3d 611, 616–17 (Tex. 2007); *In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). However, when a trial court terminates a parent-child relationship, the trial court's appointment of the Department as sole managing conservator may also be "a consequence of the termination pursuant to Family Code section 161.207." *In re A.S.*, 261 S.W.3d at 92. Section 161.207 provides: "If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Protective and Regulatory Services, a licensed child-placing agency, or an authorized agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a) (Vernon 2008). Mother cites no authority for the assumed proposition that Section 153.131(a) applies to a parent whose relationship has been terminated under Chapter 161. Indeed, when a court terminates the parent-child relationship, the court also "divests the parent and the child of

all legal rights and duties with respect to each other." Tex. Fam. Code Ann. § 161.206 (Vernon 2008).

Accordingly, we affirm the trial court's decision to appoint the Department, rather than Mother, as managing conservator of A.W.B. "as a consequence of the termination." Mother's fifth issue is overruled.

## CONCLUSION

Having overruled all of appellant's issue, we affirm the trial court's decree for termination.


/s/    William J. Boyce
        Justice


Panel consists of Justices Seymore, Boyce, and McCally.