# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00383-CV

**In re Joshua Michael Wean**

### ORIGINAL PROCEEDING FROM COMAL COUNTY

### M E M O R A N D U M   O P I N I O N

This original proceeding involves the trial court's finding that Joshua ("Josh") Michael Wean, the respondent in the underlying divorce proceeding, committed "family violence" as defined in section 71.004(1) of the Texas Family Code against his children, and that family violence was likely to occur in the future. Pursuant to section 85.001 of the family code, the trial court signed a final protective order against Josh based on the finding of family violence. Josh filed a petition for writ of mandamus in this Court to compel the trial court to vacate its protective order, asserting that the court abused its discretion in making its finding of family violence. We conditionally grant the writ.

*Background*

On July 14, 2009, Sarah Irene Wean—the real party in interest in this mandamus proceeding—filed a petition for divorce from her husband Josh—the relator. Josh and Sarah have three children: their elder son J.W., who was born in 2004; their younger son J.M.W., who was born

in 2006; and their daughter M.E.W., who was born in 2008. Mediation in the divorce proceedings was scheduled for April 27, 2010.

In early April 2010, the Child Protective Services division of the Texas Department of Family and Protective Services ("CPS") commenced an investigation of alleged physical abuse by Josh against his children. Such investigation began when Sarah provided photographs of scrapes and marks on her children to the court-appointed psychologist, who reported Sarah's allegations to CPS.

An application for protective order on behalf of the three children against Josh was filed on April 14. Hearings were held on the application in the trial court on four separate days in April, May, and June. On July 1, 2010, the trial court signed a final protective order based on its finding that Josh "has committed family violence against the children" and that "family violence is likely to occur in the future."[1]

Josh filed a petition for writ of mandamus in this Court. He argues that the trial court's finding of family violence is an abuse of discretion, and he seeks a writ of mandamus to compel the trial court to vacate its final protective order.

*Analysis*

Mandamus relief is an extraordinary remedy and is available only in the event of a clear abuse of discretion for which there is no adequate remedy by appeal. *See In re Prudential Ins. Co.*, 148 S.W.3d 124, 135-36 (Tex. 2004); *Walker v. Packer*, 827 S.W.2d 833, 839-40 (Tex. 1992).

---

[1] The application for protective order was filed by the Comal County Criminal District Attorney's Office. The protective order action was consolidated with the pending divorce action.

2

Sarah concedes, and we agree, that Josh has no adequate remedy on appeal. *See Bilyeu v. Bilyeu*, 86 S.W.3d 278, 282 (Tex. App.—Austin 2002, no pet.). Therefore, our only consideration is whether there has been an abuse of discretion with regard to the trial court's finding of family violence as defined in family code section 71.004(1).

The general test for abuse of discretion is whether the court acted without reference to any guiding rules and principles. *Cire v. Cummings*, 134 S.W.3d 835, 838-39 (Tex. 2004). A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Walker*, 827 S.W.2d at 839. With respect to resolution of factual issues or matters committed to the trial court's discretion, the reviewing court may not substitute its judgment for that of the trial court, unless the relator establishes that the trial court could reasonably have reached only one decision. Even if the reviewing court would have decided the issue differently, it cannot disturb the trial court's decision unless it is shown to be arbitrary and unreasonable. *Id.* at 839-40. On the other hand, a trial court has no discretion in determining what the law is or applying the law to the facts. *Id.* at 840. A trial court clearly abuses its discretion when it fails to apply the law correctly. *In re Texas Dep't of Family & Protective Servs.*, 210 S.W.3d 609, 612 (Tex. 2006).

In issuing the July 1, 2010 protective order, the trial court was required to find that family violence has occurred and is likely to occur in the future. *See* Tex. Fam. Code Ann. § 85.001 (West 2008). "Family violence" is defined as:

> an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of

3

imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself.

*Id.* § 71.004(1) (West 2008).[2]

In the application for protective order, Josh was accused of both excessive corporal punishment of the children and sexual abuse against M.E.W. Josh alleges that the trial court abused its discretion in finding that he committed any act against any of his children that was intended to result in physical harm, bodily injury, assault, or sexual assault or that was a threat which reasonably placed any of his children in fear of imminent physical harm, bodily injury, assault, or sexual assault. We review all the evidence in the record.

During the hearings before the trial court, there was testimony from Debra Sterling, the Sexual Assault Nurse Examiner ("SANE") who conducted an examination of M.E.W. for sexual assault in April 2010. Sterling testified that there was no hymen injury or redness around M.E.W.'s vaginal area. She concluded that sexual assault was neither proved nor disproved, stating that it was "normal to be normal." She also testified that M.E.W. had immediately assumed a physical position that enabled Sterling to conduct the SANE exam, and that this was "unusual." However, she did not testify that the position would be more likely in a situation where there was sexual abuse, or that to her knowledge it had ever occurred in a case in which abuse had, in fact,

---

[2] Family violence is also defined to include "abuse" by a member of a family or household toward a child of the family or household, *see* Tex. Fam. Code Ann. § 71.004(2) (West 2008), which generally involves substantial harm or continuous sexual abuse, *see id.* § 261.001(1)(C), (E) (West 2008). However, this definition of family violence is not at issue here.

been confirmed to have taken place. On the contrary, Sterling drew no conclusions from M.E.W.'s position, testifying merely that she had never seen a child act in the same manner as M.E.W.

Also during the hearings, DVD recordings of "forensic interviews" of J.W. and J.M.W., which were conducted at the Children's Advocacy Center of Comal County on April 14, 2010, were played. In these interviews, both J.W. and J.M.W. indicated that when Josh spanks them, it is always on their "bottoms" and is usually done with a wooden kitchen spoon. J.W. explained during his interview that Josh spanks the three children, but that it is "not really hard" and "not very often" leaves a mark. He stated that it "doesn't really hurt," that he does not cry, but J.M.W. does "most of the time," and that M.E.W. is given "soft ones." He referred to a time when Josh spanked him twice in one day. J.M.W. stated in his interview that if he is spanked hard there will be "red spots," but that M.E.W. never has red spots. Both boys stated that both Josh and his mother change M.E.W.'s diapers. J.W. stated that most of the time M.E.W. does not cry during a diaper change but sometimes does if she has a "sore bottom." J.M.W. stated that M.E.W. sometimes cries when Sarah changes her diapers, but that he did not think M.E.W. cries when Josh does. The interviews of the children do not present evidence of anything more than parental discipline in the form of corporal punishment, and provide no evidence regarding sexual abuse of M.E.W.[3]

---

[3] We note that it is apparent from viewing the interviews that the interviewer was seeking evidence that Josh was abusive, but not evidence that Sarah was abusive or that Josh was not abusive. There was no inquiry regarding Sarah's methods of discipline or her changing M.E.W.'s diapers. When J.M.W. volunteered that "Mommy" spanks M.E.W. with her hand, the interviewer never followed up on his comment, but instead asked whether Josh spanks her too. J.W.'s statement in the interview that most of the time he does not want to go to Josh's house was preceded by the interviewer's statement that "Mommy doesn't seem bad to me, but tell me some bad things that Daddy says."

The CPS initial investigator on the Wean case testified at the hearings. She stated that although there was an ongoing investigation and CPS had not yet made any findings or conclusions, she was "confident" that M.E.W. was being "groomed" for sexual behavior, that Josh is the alleged perpetrator, and that it was not advisable for the children to be reconnected with Josh. Regarding the alleged grooming behavior, the investigator referred solely to the fact that during the SANE exam M.E.W. exposed her genitalia and was inspected without expressing any adverse reaction and "without fuss." She alleged that this behavior was "unusual." However, she provided no testimony or any other evidence that the position or calmness exhibited by M.E.W. would be usual or more likely in a situation where there was sexual abuse, or had ever occurred to her knowledge in a case in which abuse or "grooming" had, in fact, been confirmed to have taken place. Indeed, she admitted that she was also "certain that it could occur for some other reason."[4]

Regarding her conclusion that the children should not be reconnected with Josh, the investigator referred solely to the allegations regarding Josh's corporal punishment and asserted that corporal punishment is neither appropriate nor effective for children under six years old. She made no reference to the fact that J.M.W. had stated in his interview that "Mommy" spanks M.E.W. She testified that Sarah had stated to her that she was no longer incorporating physical discipline, and yet the investigator did not adjust her conclusions after having heard Sarah concede in her testimony that she continues to use spanking as a method of disciplining the children. In

---

[4] The investigator asserted both that M.E.W.'s "fussiness" when Sarah tried to remove her diaper indicated sexual abuse by Josh and that M.E.W.'s lack of "fussiness" during the SANE exam indicated sexual abuse by Josh. She also asserted that her conclusions were not inconsistent because they both involved sexual abuse by Josh.

6

reaching her conclusion that reconnection with Josh was inappropriate based on his spankings, the investigator admitted that she made no investigation of the spanking issue beyond her interview with Sarah and her viewing of the DVDs of the interviews with the children. Then, after the DVDs were shown in court while she was on the stand, the investigator admitted that nothing in the DVDs supported an allegation of abuse and that she was relying solely on Sarah's statements. She further admitted that she did not interview Josh, that she had received a voice mail from Josh's attorney, but never returned his call, and that it was "not unusual" to have no conversations with the alleged perpetrator prior to the court hearing.[5] This was in the context of her having relied on her interview of Sarah to rule her out as the perpetrator of any sexual abuse of M.E.W. The investigator's only contact with Josh was a telephone call in which she informed Josh that there were allegations of abuse and neglect and that there would be an investigation. Regarding that phone call, she testified that she found suspicious her observation that when informed of allegations of abuse, Josh gave no indication of concern for his children's welfare. However, she did not explain any reason why, if Josh were in fact innocent, he would be concerned about his children's welfare upon learning of an allegation that he was not innocent.

It is abundantly clear from the CPS investigator's testimony that she based her opinions regarding abuse solely on Sarah's allegations and that she considered those allegations sufficient to conclude that Josh was a perpetrator of abuse against his children and to testify to that

---

[5] A CPS investigator did interview Josh in May 2010, but was not called to testify at the hearings.

7

effect. We conclude that neither the SANE exam results, the interviews of J.W. and J.M.W., nor the CPS investigator's testimony provides support for a finding of family violence.

The only evidence remaining that might support the allegation of sexual abuse is Sarah's testimony. Sarah based her allegations on her observations that, while they were still living together, Josh appeared "too interested" and took "too much time" in changing M.E.W.'s diapers, in contrast with his alleged earlier aversion to changing J.W.'s and J.M.W.'s diapers. His stated excuse was that he "just wanted to be helpful." Sarah also found suspicious that during their marriage Josh was "very interested in my private areas." Sarah further testified that, after Josh had moved into his parents' house in late 2009, the first few days after the children returned from a visit with Josh, M.E.W. would cry and fuss during her diaper changes and would be red around her vaginal area as if she had been rubbed.

However, there is no evidence to support Sarah's suspicions or conjectures.[6] Josh denied molesting M.E.W. No other witness testified to Josh's interest in M.E.W.'s diaper changes, or to M.E.W.'s redness or increased fussiness. The SANE exam indicated no hymen injury or redness. J.W. and J.M.W. in their interviews stated that both Josh and his mother change M.E.W.'s diapers when they are staying with Josh, and the CPS investigator admitted that nothing in the interviews indicated abuse. Josh testified that his mother did most of M.E.W.'s diaper changes.

---

[6] The CPS investigation report, which was issued after the hearings in the trial court, reached the conclusion that there was "no evidence to substantiate sexual abuse has occurred" and labeled Sarah's allegations of sexual abuse of M.E.W. as "Unable to Determine." The report did conclude that there was "risk" of sexual abuse. However, the stated basis for such risk was not the SANE exam results or the children's interviews, but rather "the father's high sex drive being unmet by his wife, his failure to participate in polygraph regarding these allegations, and his belief that his children and wife should submit to his will."

8

Likewise, Josh's mother testified that she could only recall two occasions in the past year in which Josh changed M.E.W.'s diapers instead of her. She did not testify to observing any unusual redness or fussiness when she changed M.E.W.'s diapers. A family friend of Josh and Sarah testified that she had observed Josh changing J.W.'s diapers without any reluctance. Moreover, Sarah's earlier behavior was not entirely consistent with her testimony. There was evidence that she left Josh alone with the children in April, August, and September of 2009, despite her assertion that she had observed inappropriate interest by Josh in changing M.E.W.'s diapers and had insisted on handling M.E.W.'s diaper changes. In addition, Sarah did not communicate to anyone any concerns or observations regarding Josh's interactions with M.E.W. until her meeting with CPS—whose involvement was triggered by her reporting of scrapes and marks on the children—and her amending her petition on April 12, 2010, to seek sole managing conservatorship of the children.

Viewing all the evidence, we conclude that the trial court's finding of family violence as defined in family code section 71.004(1) does not find support in the allegations made of sexual abuse. Consequently, the finding of family violence, to be within the trial court's discretion, must find its basis in the allegations that Josh employed excessive corporal punishment on the children.[7]

---

[7] We note that although the trial court did not explain what conduct was the basis for its findings of family violence, a review of the protective order indicates that the court relied on the allegations regarding corporal punishment, not sexual abuse. The protective order prohibits the use of corporal punishment, but does not prohibit or otherwise refer to Josh's changing M.E.W.'s diapers. In addition, the order requires that Josh complete battering intervention and parenting programs but does not require participation in any programs related to sexual abuse.

As an initial matter, we observe that the fact that a child is spanked, on its own, does not evidence family violence. *See In re A.S.*, 261 S.W.3d 76, 88 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) ("[I]nfrequent spankings of a child that leave 'marks' or visible bruises 24 hours after the spanking do not constitute sufficient evidence to demonstrate that a parent has engaged in conduct that endangered a child's physical or emotional well-being."). A parent generally has discretion to use some amount of corporal punishment. *See* Tex. Fam. Code Ann. § 151.001(e)(1) (West 2008) (parent may use corporal punishment for reasonable discipline of child), § 151.003 (West 2008) ("A state agency may not adopt rules or policies or take any other action that violates the fundamental right and duty of a parent to direct the upbringing of the parent's child."). Therefore, for corporal punishment to constitute family violence, there must be some evidence—such as severity of injury, type of instrument used, or mental or emotional state of the perpetrator—that would transcend a reasonable level of parental discretion regarding discipline.

In connection with the allegations of excessive corporal punishment, six photographs of the children were entered into evidence. Four of the photographs show scrapes or marks on locations that are not indicative of spankings. Josh testified to the causes of these marks—e.g., the scrapes on M.E.W.'s knee was attributed to her tripping and skinning her knee on his driveway, and the red dot above J.M.W.'s buttocks was attributed to a bug bite—and there was no evidence of any cause for the marks other than those described by Josh. Indeed, there is no evidence in the record of any physical acts by Josh against his children other than spankings on the children's buttocks (and a "flick" of the finger on M.E.W.'s forehead). The remaining two photographs show red marks on a child's buttocks, identified as J.M.W.'s. Sarah alleged that she took the pictures

when J.M.W. returned from a spring break trip with Josh, and that J.M.W. told her the marks were from Josh's spanking that same day. In contrast, Josh and his mother each testified that J.M.W. obtained the marks by falling against a nightstand while Josh was at work during the day. Regardless of the source of the marks in the two photos, however, they do not show the coloring of a bruise, and do not appear significant. Dr. David Gunzberger, the court-appointed psychologist in the case, testified that he made the report to CPS when Sarah provided him the photographs on April 1, 2010, but admitted that he would not have decided such reporting was required if he had been provided the photos but not heard Sarah's commentary about the situation. Moreover, Sarah herself testified that the photographs themselves showed only "a three" on "a scale of one to 10 and 10 being the most severe result from spanking." We conclude that the trial court's finding of family violence does not find support in the six photographs showing marks or scrapes on the children's skin.[8]

Also at the hearings, there was evidence regarding Josh's religious beliefs. According to Sarah, Josh believed that children were born sinful, wicked, and willful and needed their will to be broken in order for them to be obedient, and such message was preached at their church. Sarah testified that Josh believed spanking is mandated by the Bible and she needed to follow his directives regarding discipline because he was the head of the household. She alleged that Josh believed women were created for men, that their roles were unequal, and that women do not need education beyond high school because their "only role" is as wife and mother. According to Sarah, Josh

---

[8] The CPS investigation report—issued after the hearings in the trial court—characterized the photographs merely as "superficial marks or bruises" and concluded that the allegations of physical abuse were "Ruled Out." The report also concluded that there was "concern for risk of abuse in the future," but based such concern not on the photographs but on the alleged "inflexibility and intolerance of minor behavioral infractions on the part of the children" by Josh.

pressured his boys to pray and read the Bible daily. Sarah alleged that Josh's beliefs were evidenced by publications available from Vision Forum Ministries, the Christian company for which Josh was the chief financial officer. One of the many books available for purchase on the Vision Forum website, which was admitted into evidence, instructed parents to spank their children in the privacy of the home and stated that spanking a disobedient child is required by God and is an act of love. A handful of articles posted on the website were also admitted into evidence, which articles stated that the husband and father is head of the household and that man has headship over woman.

Other evidence controverted some of Sarah's descriptions of Josh's religious beliefs. Josh testified that he believes everyone struggles with sin and needs a savior and that his main goal was to teach his children that God loves them and they can have a relationship with him. While Josh testified to his belief that the husband is the head of the household and ordered by God to lead his family, a July 2009 letter to Sarah from Josh, offered into evidence by Sarah, refers to their "decision-making together" and states, "I want you to know I trust you to make your own decisions." Josh also testified that he had not read and did not necessarily agree with every publication available through Vision Forum. Moreover, the wife of Vision Forum's president had a university degree and testified that Vision Forum's doctrine was that the Bible should be upheld and, therefore, that children should obey both their father and mother. In fact, Sarah had written a book—published by Vision Forum—that encouraged children to obey their mother.

Regardless of whether Sarah's description of Josh's beliefs is accurate, however, such beliefs would not constitute evidence of family violence. We recognize that concepts such as favoring male leadership or promoting corporal punishment could conceivably be manipulated to

12

hide or justify family violence, support an unhealthy balance of control in a marital relationship, or repress a victim's attempts to seek protection. However, there is no evidence in the record that the beliefs—by themselves—make the existence of family violence more likely. We cannot agree that the fact a parent believes that a person is born with a "sinful nature," that spanking as a form of discipline is endorsed by the Bible, or that the husband is the "head" in a marital relationship is thereby evidencing to CPS or the judicial system that such parent engages, or is likely to engage, in violence or abuse against his or her children.[9] We conclude that the trial court's finding of family violence does not find support in the evidence regarding Josh's or his employer's religious beliefs.

Consequently, the finding of family violence against Josh rests on the eyewitness testimony of Josh's methods of discipline. The witness testimony is consistent that Josh's spankings were always directed at the children's buttocks, and that he usually used a wooden kitchen spoon. Josh explained that his use of the spoon was so that the children did not associate his hand or touch with discipline. Sarah conceded that, when he spanked, Josh never was angry or lost his temper.

Sarah testified that Josh's spankings always left a mark because he felt that "if it didn't hurt, then it didn't count." She testified that there were always "welts," and at their severest were purple. The children, especially J.M.W., would cry sometimes in anticipation of a spanking. Sarah further testified that Josh began spanking each child when they were three or four months old—as soon as they were old enough to display "willful behavior." Josh agreed that reasons a spanking might occur included arguing, fighting, disobeying, and lying, and Sarah also stated Josh

---

[9] The CPS investigator testified that her viewing of the Vision Forum website indicated to her that the father, not the mother, is to set rules and boundaries in the family, and that this was evidence of abuse.

would spank them if they whined. She stated that Josh never used any other type of discipline other than spanking. She also testified—and Josh conceded—that spankings had occurred multiple times during a day as well as multiple days in a row. She added that if it were her decision the children would still have been spanked, but not nearly as often.

Sarah's testimony, by itself, is not evidence of family violence as defined in section 71.004(1) of the family code. Moreover, no other testimony or evidence supports Sarah's description of the spankings' severity. Josh testified that he did not leave bruises, although he conceded that a spanking might initially leave a red mark but it never lasted. J.W.'s and J.M.W.'s interviews corroborate this. He also asserted that he did not spank the children until they were close to two years old. Josh's mother testified that Josh incorporated methods of discipline other than spanking, that no spankings occurred until after the child had begun walking, that his spankings were not very hard, that she could recall only two spankings during the children's stay over spring break, and that she had never seen any bruises from spanking. Josh's father testified that he had never seen M.E.W. get spanked, that from his observations Josh's discipline is always constructive and gentle, and that the kids might cry before a spanking but if they cried afterward it lasted less than a minute. Family friends who testified on the subject denied observing any inappropriate methods of discipline. Even Sarah's mother, when asked in her deposition in February 2010 regarding custody issues and Josh's parenting, made no mention of any concerns regarding Josh's methods of discipline. Similarly, despite her testimony that during the marriage she confronted Josh "on several occasions about the bruises and the marks," Sarah made no reference to that concern during her January 2010 deposition in response to questioning about her children's best interests, and she had sought

14

joint managing conservatorship from the time of her July 14, 2009 filing of the initial petition for divorce until her April 12, 2010 filing of the second amended petition. Also, neither the CPS investigator's testimony nor the court psychologist's testimony provides any evidence that the spankings in the Wean household rose to the level of family violence. Perhaps most significant, both the interviews of J.W. and J.M.W. and the photographs of J.M.W.'s buttocks are consistent with Josh's spankings not rising to the level of family violence.

We also note the incongruity between the scarcity of evidence that Josh's spankings constitute family violence and the significance of the requirements placed on Josh by the final protective order. Under the protective order issued by the trial court, Josh is prohibited from communicating with his children other than through the parties' attorneys, communicating with the children on the telephone until further order of the court, or going within 200 yards of his children's child care facility or school. The protective order requires him to complete a battering intervention program and prohibits him from possessing a firearm. Josh's possession of the children is restricted to one two-hour visit a week at a facility providing supervised visitation and at Josh's expense. Sarah's attorney was awarded $15,000 in attorneys' fees. These requirements have been imposed despite any evidence of a single physical act by Josh against the children other than spanking them on their buttocks, using a wooden kitchen spoon and without exhibiting anger. Given the lack of evidence that Josh's use of corporal punishment rose to the level of family violence, the only reasonable decision was to make a finding of no family violence under section 85.001 of

15

the family code.[10]  We conclude that it was an abuse of discretion for the trial court to issue its final protective order.

### *Conclusion*

We conditionally grant the relator's petition for writ of mandamus and direct the trial court to vacate its July 1, 2010 "Final Protective Order."  The writ will issue only if the trial court fails to comply.

_____

G. Alan Waldrop, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Filed:   August 31, 2010

---

[10]  We express no opinion regarding whether some form of limitation on the use of corporal punishment would or would not be appropriate.  We hold only that the evidence in this record does not support a finding of "family violence" as defined in family code section 71.004(1), nor the implementation of statutory remedies that flow from such a finding.