# NO. 12-11-00243-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE 354TH* |
| | § | *JUDICIAL DISTRICT COURT* |
| *H.L.F., A CHILD* | § | *RAINS COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

F.N.F. and A.D. appeal the termination of their parental rights to H.L.F.  F.N.F. and A.D. jointly raise four issues on appeal.[1]  We affirm in part and reverse and render in part.

## BACKGROUND

F.N.F. and A.D. (collectively Appellants) are the parents of H.L.F., who was born on January 8, 2010, while her mother, F.N.F., was in state jail.  At the time of H.L.F.'s birth, F.N.F. had an open case with the Department of Family and Protective Services (the Department or CPS) involving her two oldest children, J. and G., who were living with F.N.F.'s grandparents.  On January 11, 2010, the Department filed a petition for protection of H.L.F., for conservatorship, and for termination in a suit affecting the parent-child relationship.  That same day, the trial court signed an emergency order naming the Department as temporary sole managing conservator of H.L.F.  On February 8, 2010, an adversary hearing was held in which neither appellant appeared personally or through an attorney of record.  The trial court appointed the Department as temporary managing conservator, and F.N.F. as temporary possessory conservator, of H.L.F.  H.L.F. was placed with F.N.F.'s cousin and her husband, E.H. and B.H.,

---

[1] To protect the identity of the child who is the subject of this suit, we use aliases to identify the various parties involved.  *See* TEX. R. APP. P. 9.8(b)(2).

on February 15, 2010, and has remained with them throughout the pendency of the case. On September 17, 2010, E.H. and B.H. filed a petition for intervention, seeking conservatorship of H.L.F.

A jury was selected on June 20, 2011, and the case proceeded to trial.[2] Ultimately, ten jurors determined that the parent-child relationship between Appellants and H.L.F. should be terminated. The trial court subsequently appointed E.H. and B.H. as the permanent managing conservators of H.L.F.

### TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *In re C.L.C.*, 119 S.W.3d 382, 390 (Tex. App.—Tyler 2003, no pet.); *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.—Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001). When the state seeks to terminate one's parental rights, it seeks not only to infringe one's fundamental liberty interest, but to end it. *See In re J.F.C.*, 96 S.W.3d 256, 273 (Tex. 2002). A termination decree is "complete, final, irrevocable [and] divests for all time the parent and child of all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit." *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.—El Paso 1998, no pet.). Thus, the breaking of bonds between a parent and child "can never be justified without the most solid and substantial reasons." *Wiley*, 543 S.W.2d at 352; *In re Shaw*, 966 S.W.2d at 179. Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley*, 543 S.W.2d at 352; *In re Shaw*, 966 S.W.2d at 179. However, parental rights are not absolute, and it is vital that the emotional and physical interests of the child not be sacrificed at the expense of preserving that right. *See In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Section 161.001 of the Texas Family Code permits the termination of parental rights if two elements are met. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2012). First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. *Id.* § 161.001(1) (West Supp. 2012); *In re C.L.C.*, 119 S.W.3d at 390. Second,

---

[2] The original dismissal date for this case was January 17, 2011. On December 22, 2010, the presiding judge extended the dismissal date to July 9, 2011. *See* TEX. FAM. CODE ANN. § 263.401(a) (West 2008).

termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(2) (West Supp. 2012); *In re C.L.C.*, 119 S.W.3d at 390. Both elements must be proved by "clear and convincing evidence," and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *In re C.L.C.*, 119 S.W.3d at 390. "Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM. CODE ANN. § 101.007 (West 2008). Because there is a strong presumption that the best interest of the child is served by preserving the parent-child relationship, the burden of proof rests upon the party seeking to deprive the parent of his or her parental rights. *See Wiley*, 543 S.W.2d at 352; *In re C.L.C.*, 119 S.W.3d at 391.

## TRIAL COURT'S DENIAL OF MOTION TO STRIKE

In their first issue, Appellants argue that the trial court erred in denying F.N.F.'s motion to strike the Department's pleadings because the order authorizing H.L.F.'s removal was signed by a judge without authority. Appellants contend that the order appointing the Honorable Judge William C. Martin to hear child protection cases had expired by the time Judge Martin approved the removal of H.L.F. and named the Department temporary managing conservator. Appellants argue that Judge Martin had no authority to sign the orders and as a result, the orders granting the Department temporary managing conservatorship of H.L.F. are void.

The record on appeal does not contain an order of referral effective on January 11, 2010, or February 8, 2010—the dates on which Judge Martin granted temporary managing conservatorship of H.L.F. to the Department. But the record does contain an order that expired in August 2007 appointing Judge Martin to hear the "Foster Care Docket and Sabine Valley Child Protection Docket" pursuant to Section 74.056 of the government code. Accordingly, we conduct our analysis under Chapter 74 of the government code.

### Applicable Law and Analysis

We review a trial court's ruling on a motion to strike pleadings for abuse of discretion. *See In re N.L.G.*, 238 S.W.3d 828, 829 (Tex. App.—Fort Worth 2007, no pet.).

Section 74.056 provides that a presiding judge shall assign the judges of the administrative region to hold special or regular terms of court in any county of the administrative

3

region to try cases and dispose of accumulated business.  TEX. GOV'T CODE ANN. § 74.056(a) (West 2005).  If a party to a civil case files a timely objection to the assignment, the judge shall not hear the case.  *See* TEX. GOV'T CODE ANN. § 74.053(b) (West 2005).  An assigned judge is disqualified to preside over a civil matter when a party files a timely objection to his assignment.  *See id.*; *Ex parte Holland*, 807 S.W.2d 827, 828 (Tex. App.—Dallas 1991, writ dism'd w.o.j.) (assigned judge automatically disqualified upon timely objection).  If an assigned judge continues to preside over a matter despite a timely objection, any subsequent orders he issues are nullities.  *Id.*

To be timely, an objection must be filed "not later than the seventh day after the date the party receives actual notice of the assignment or before the date the first hearing or trial, including pretrial hearings, commences, whichever date occurs earlier."  TEX. GOV'T CODE § 74.053(c).  An objection must be timely filed and made without regard to the terms of the particular order under which the judge is assigned.  *See In re Canales*, 52 S.W.3d 698, 704 (Tex. 2001); *see also Adame v. Law Office of Allison & Huerta*, No. 13-04-670-CV, 2008 WL 2151454, at *3 (Tex. App.—Corpus Christi May 22, 2008, pet. denied) (mem. op.) (once assigned judge hears any matter in a case, parties have waived right to object under Section 74.053 of the government code) (citations omitted).

The first order issued by Judge Martin was signed January 11, 2010.  This order named the Department temporary sole managing conservator of H.L.F.  On February 8, 2010, Judge Martin signed a second order, which appointed the Department as temporary managing conservator of H.L.F.  Judge Martin presided over five hearings after signing the February 8, 2010 order before any objection was lodged.  On August 10, 2010, F.N.F. filed an "Objection to Associate Judge and Motion to Modify Temporary Orders."  It was in this August 10, 2010 motion that F.N.F. first pointed out that there was no assignment order authorizing Judge Martin to hear the case.  Judge Martin did not preside over any subsequent hearings after F.N.F. filed her objection.  But because Appellants did not object to Judge Martin's assignment until after Judge Martin had presided over several hearings, their objection was untimely.  *See In re Canales*, 52 S.W.3d at 703-04.  Because the objection was untimely, the trial court did not abuse its discretion in denying F.N.F.'s motion to strike the Department's pleadings on the basis that the January and February 2010 orders were void.  We overrule Appellants' first issue.

4

## TERMINATION OF PARENTAL RIGHTS—SUFFICIENCY OF THE EVIDENCE

In their remaining issues, Appellants challenge the sufficiency of the evidence to support termination. When, as here, the burden of proof is clear and convincing evidence, we conduct a legal sufficiency review by looking at all of the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 266. We must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id.* Thus, it follows that the reviewing court should disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible, but this does not mean that the reviewing court must disregard all evidence that does not support the finding. *Id.* Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* If, after conducting our legal sufficiency review, we determine that no reasonable fact finder could form a firm belief or conviction that the matter which must be proven is true, then we will conclude that the evidence is legally insufficient. *Id.*

When we conduct a factual sufficiency review, we must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing. *Id.* Our inquiry is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *Id.* We consider whether the disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. *Id.* If, when viewed in light of the entire record, the disputed evidence is so significant that a fact finder could not have reasonably formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* In finding evidence factually insufficient, the appellate court should detail why it has concluded that a reasonable fact finder could not have credited disputed evidence in favor of its finding. *Id.* at 267.

The standard of review for legal and factual sufficiency challenges maintains a deferential standard for the fact finder's role, which means the trier of fact is the exclusive judge of the credibility of the witnesses and weight to be given their testimony. *In re C.H.*, 89 S.W.3d at 26-27; *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.—Houston [1st Dist.] 1997, pet. denied). Thus, our review must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt. *In re C.H.*, 89 S.W.3d at 26.

In their second issue, Appellants contend the evidence is legally and factually insufficient to terminate F.N.F.'s parental rights pursuant to Texas Family Code Section 161.001(1), subsections (D), (E), and (O). We agree. Because the evidence is legally insufficient to support termination of F.N.F.'s parental rights pursuant to subsections (D), (E), and (O), we do not address Appellants' challenge to the factual sufficiency of the evidence in regard to subsections (D), (E), and (O), nor do we address the sufficiency of the evidence pertaining to H.L.F.'s best interest. *See* TEX. R. APP. P. 47.1.

**Termination Under Section 161.001(1)(D)**

At trial, the jury found that F.N.F. knowingly placed or knowingly allowed H.L.F. to remain in conditions or surroundings that endangered H.L.F.'s physical or emotional well being. *See* TEX. FAM. CODE ANN. § 161.001(1)(D) (West Supp. 2012).

**1.     Applicable Law**

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well being of the child. *See id.* § 161.001(1)(D). This provision addresses the child's surroundings and environment, rather than parental conduct. *In re C.L.C.*, 119 S.W.3d at 392. The relevant time frame to consider in determining whether there is clear and convincing evidence of endangerment is before the child was removed. *Ybarra v. Tex. Dep't of Human Servs.*, 869 S.W.2d 574, 577 (Tex. App.—Corpus Christi 1993, no pet.).

When seeking termination under subsection (D), the Department must show that the child's living conditions pose a real threat of injury or harm. *See In re N.R.*, 101 S.W.3d 771, 776 (Tex. App.—Texarkana 2003, no pet.). Some courts have held that illegal drug use and drug-related criminal activity by parents and caregivers could create an environment that endangers a child's physical or emotional well being. *See In re D.C.*, 128 S.W.3d 707, 715-16 (Tex. App.—Fort Worth 2004, no pet.). But the party seeking termination must still present clear and convincing evidence of the child's actual physical surroundings or conditions that were created by the endangering conduct in order to satisfy the requirements of subsection (D). *See, e.g.*, *In re D.J.H.*, No. 04-11-00668-CV, 2012 WL 3104502, at *6 (Tex. App.—San Antonio

6

Aug. 1, 2012, no pet.) (fact finder could conclude parent's pattern of criminal activity subjected him to possibility of incarceration, thereby negatively affecting child's living environment and emotional well being); *In re A.S.*, 261 S.W.3d 76, 84-85 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). However, the fact that a mother used a controlled substance while she was pregnant and did not obtain routine prenatal care does not mean that termination is automatic. *See, e.g., id.* at 83-87.

Additionally, imprisonment can be used as a factor to consider on the issue of endangerment, but imprisonment alone is not enough to terminate the rights of a parent to her child. *See In re D.T.*, 34 S.W.3d 625, 636 (Tex. App.—Fort Worth 2000, pet. denied).

### 2. Analysis

The record contains some evidence that is favorable to the jury's finding. According to the testimony at trial, F.N.F. had an open CPS case regarding her two oldest children, J. and G., at the time of H.L.F.'s birth. J. and G. were living with F.N.F.'s grandmother while F.N.F. was in state jail. F.N.F. used methamphetamine during the first trimester of her pregnancy and acknowledged that she placed H.L.F. in danger by using methamphetamine during this time period. Additionally, F.N.F. attended only one prenatal doctor's visit while she was pregnant with H.L.F. F.N.F. gave birth to H.L.F. on January 8, 2010, while she was serving her state jail sentence.

Contrary to the finding, however, the Department presented no evidence to explain how F.N.F.'s drug use created an endangering condition or surrounding for H.L.F. while she was in the womb. Furthermore, Dr. Thomas Allen testified that it was "more likely than not" that F.N.F.'s methamphetamine use had no effect on H.L.F. Allen explained that it is a "false assumption" that a child would experience "dramatic neurological damage" when a mother does not use methamphetamine "throughout the whole nine months" of her pregnancy and has the levels of methamphetamine in her system as was the case when F.N.F. tested positive during the first trimester of her pregnancy. Allen further testified that if H.L.F. was going to have any neurological damage due to F.N.F.'s methamphetamine use, "it would be observable by now."

The Department did not present any evidence that H.L.F. tested positive for any controlled substance, that she needed specialized medical treatment, or that she suffered from any birth defects, abnormalities, or complications as a result of F.N.F.'s drug use during the first

trimester of her pregnancy. At the time of the removal, F.N.F. had not had possession of H.L.F. Therefore, F.N.F. could not have exposed H.L.F. to endangering conditions or surroundings between the time of H.L.F.'s birth and the time of her removal. *See, e.g., In re S.N.*, 272 S.W.3d 45, 62 (Tex. App.—Waco 2008, no pet.) (op. on reh'g) (limited evidence in the record regarding the home environment at time of removal suggests adequate living conditions); *In re A.S.*, 261 S.W.3d at 83-85 (evidence insufficient when child removed at birth and Department offered no evidence of actual surroundings or conditions). F.N.F. had arranged for her mother, S.Y., to take H.L.F. home from the hospital, but CPS policy prohibited S.Y. from taking the child. The Department offered a case closure agreement signed by F.N.F. and S.Y. to support its policy determination. But the case closure agreement does not provide evidence of any endangering conditions or surroundings H.L.F. would have been exposed to had she gone home with S.Y. from the hospital. Moreover, CPS Investigator Terri Baker testified that although the initial intake report stated that H.L.F. was born while her mother was in prison, she did not know until after H.L.F. was in CPS care that F.N.F. wanted S.Y. to have the child. CPS Supervisor Patricia Skelton approved H.L.F.'s removal from the hospital without F.N.F.'s consent and without a court order. Skelton also testified that despite her contact with F.N.F.'s relatives due to the open case involving J. and G., she did not remember talking about H.L.F. with anyone prior to her birth.

The Department's and Intervenors' sole argument in favor of termination of F.N.F.'s parental rights under subsection (D) is based on the fact that F.N.F. used methamphetamine prior to and during the first trimester of her pregnancy. They implicitly contend that this created an endangering condition or surrounding inside F.N.F.'s womb before H.L.F. was born. The Department and the Intervenors cite a number of cases in which termination pursuant to subsection (D) was affirmed when a mother used illegal drugs while she was pregnant. But each of those cases involved a mother who abused one or more controlled substances throughout her pregnancy and had a child who was born addicted to the controlled substance or with the controlled substance still in the child's system.[3] Therefore, these cases are inapposite.

---

[3] *See generally In re B.R.*, No. 02-11-0146-CV, 2011 WL 5515502 (Tex. App.—Fort Worth Nov. 10, 2011, no pet.) (mem. op.) (mother used heroin while pregnant and was high when she gave birth); *In re K.L.B.*, No. 14-09-00061-CV, 2009 WL 3444833 (Tex. App.—Houston [14th Dist.] July 16, 2009, no pet.) (mem. op.) (mother tested positive for cocaine when child born prematurely); *In re J.M.*, No. 02-08-259-CV, 2009 WL 112679 (Tex.

8

### 3. Conclusion

After viewing the evidence in the light most favorable to the finding and reviewing the undisputed facts, we conclude that no reasonable fact finder could form a firm belief or conviction that F.N.F. knowingly placed or knowingly allowed H.L.F. to remain in conditions or surroundings that endangered her physical or emotional well being. *See **In re J.F.C.***, 96 S.W.3d at 266; *see also **In re A.S.***, 261 S.W.3d at 83-85. Therefore, we hold that the evidence is legally insufficient to terminate F.N.F.'s parental rights pursuant to subsection (D).

## Termination Under Section 161.001(1)(E)

At trial, the jury also found that F.N.F. engaged in conduct or knowingly placed H.L.F. with persons who engaged in conduct that endangered H.L.F.'s physical or emotional well being. *See* TEX. FAM. CODE ANN. § 161.001(1)(E) (West Supp. 2012).

### 1. Applicable Law

A court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well being of the child. *See **id.*** § 161.001(1)(E). "Endanger" means more than a threat of metaphysical injury or the possible ill effects of a less than ideal environment. ***Texas Dep't of Human Servs. v. Boyd***, 727 S.W.2d 531, 533 (Tex. 1987). It is not necessary that the conduct be directed at the child or that the child actually suffers injury. ***Id.*** It is sufficient that the child's well being be jeopardized or exposed to loss or injury. ***In re J.J.***, 911 S.W.2d 437, 440 (Tex. App.—Texarkana 1995, writ denied). The cause of the endangerment must be the direct result of the parent's conduct and must be the result of a continuing course of conduct rather than a single act or omission. ***In re A.S.***, 261 S.W.3d at 83, 86; *see also **In re Baby Boy R.***, 191 S.W.3d 916, 925 (Tex. App.—Dallas 2006, pet. denied) (instability and incarceration can be continuing course of conduct supporting termination).

---

App.—Fort Worth Jan. 15, 2009, no pet.) (mem. op.) (child tested positive for cocaine at birth); ***In re U.P.***, 105 S.W.3d 222 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (child born addicted to cocaine and barbiturates); ***In re M.J.M.L.***, 31 S.W.3d 347 (Tex. App.—San Antonio 2000, pet. denied) (child born with narcotics in system); ***In re W.A.B.***, 979 S.W.2d 804 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (mother and child tested positive for cocaine at birth); ***Dupree v. Tex. Dep't of Protective & Regulatory Servs.***, 907 S.W.2d 81 (Tex. App.—Dallas 1995, no writ) (mother used cocaine weekly during pregnancy and day of child's birth).

Courts look to what the parent did both before and after the child's birth to determine whether termination is necessary. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). Conduct toward other children is a relevant consideration under subsection (E), and courts may also consider a parent's use of illegal drugs during pregnancy as endangering conduct supporting termination. *In re C.R.*, 263 S.W.3d 368, 372 (Tex. App.—Dallas 2008, no pet.); *In re Baby Boy R.*, 191 S.W.3d at 925; *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). Finally, a parent's imprisonment may be considered as a factor on the issue of endangerment, but imprisonment alone will not constitute endangerment. *See Latham v. Dep't of Family & Protective Servs.*, 177 S.W.3d 341, 348 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *In re C.L.C.*, 119 S.W.3d at 397; *In re D.T.*, 34 S.W.3d at 636.

## 2. <u>Evidence in the Light Most Favorable to the Finding</u>

F.N.F. testified that she began using methamphetamine in 2001 and is addicted to both methamphetamines and marijuana. She went to an inpatient drug rehabilitation facility for her methamphetamine addiction in 2005, 2007, and 2008, but relapsed each time. F.N.F. had drug-related criminal history dating back to 2007, when she was placed on deferred adjudication probation for the offense of possession of methamphetamine. F.N.F. testified that her deferred adjudication probation was modified after she was arrested for possession of marijuana and tested positive in a random drug test in February 2008. During the summer of 2009, F.N.F. pleaded guilty to misdemeanor possession of marijuana and placed her two oldest children, J. and G., with her grandparents. F.N.F. submitted to a hair follicle test upon CPS's request on July 16, 2009. CPS informed F.N.F.'s probation officer, Jerry Beare, that F.N.F. tested positive for methamphetamine. F.N.F.'s probation was subsequently revoked on July 27,2009, she was sentenced to confinement in state jail, and was released on April 2, 2010.

Probation Officer Beare testified that F.N.F. admitted using methamphetamine while she was pregnant, and told him that she planned to have an abortion. A.D. testified that he believed F.N.F. may have used methamphetamine "shortly after" she became pregnant with H.L.F. F.N.F. attended only one prenatal visit prior to her state jail confinement and gave birth to H.L.F. while in state jail.

10

Other testimony revealed that prior to F.N.F.'s state jail confinement, CPS became involved in her life because her drug use was endangering her oldest children's physical and emotional well being. A.D. testified that F.N.F. used methamphetamine when J. and G. were in their house. When asked whether F.N.F. operated a motor vehicle while under the influence of methamphetamine with J. and G. in the car, A.D. answered, "I'm sure she has."

F.N.F. confirmed that her middle child, G., tested positive for marijuana at birth. She acknowledged that it was reckless for her to use drugs while she was pregnant. She testified that it bothered her that G. tested positive for marijuana, but she still used drugs during the first trimester of her pregnancy with H.L.F. because she was an addict.

Finally, CASA Supervisor Mandy Kennedy testified that F.N.F. did not regularly attend Narcotics Anonymous meetings. Although F.N.F. had negative results for her drug tests, Kennedy thought the results for two tests were questionable.

### 3. <u>**Undisputed Facts Not Supporting the Finding**</u>

It is undisputed that H.L.F. was born free of birth defects and medical conditions and did not test positive for any controlled substance. It is also undisputed that, despite F.N.F.'s admission that she used methamphetamine while she was pregnant with H.L.F., neither the Department nor CASA recommended termination of F.N.F.'s parental rights to J. or G. Approximately nine months before trial, F.N.F. obtained joint managing conservatorship of J. and G. F.N.F.'s parental rights to J. and G. were not terminated, and by the time of trial in this case, she had obtained unsupervised overnight visits with both children.

All of F.N.F.'s drug test results were negative, and F.N.F. testified that at the time of trial, she had fourteen consecutive months of "free world" sobriety. The Department did not present evidence of drug use while F.N.F. was in state jail or after her release. F.N.F. attended Narcotics Anonymous meetings, was on step four of the twelve-step program, had a sponsor, and served as the treasurer for her group. F.N.F. testified that in addition to attending the meetings and regular counseling sessions, she attended a local church to help her recover from her addiction.

Israel Lewis, a licensed professional counselor and therapist, testified that the likelihood of a relapse decreases with each day of sobriety, although it will always remain a possibility. Dr. Thomas Allen, a forensic psychologist, confirmed that the prognosis for a methamphetamine addict who has been "meth free" for one year is "excellent," and testified that F.N.F.'s risk of

relapse is "slim." Finally, O'Quinn Demery, Jr., a drug and alcohol counselor for the East Texas Council on Alcohol and Drug Abuse testified that a person is in full remission from their addiction after one year of sobriety.

During the pendency of the case, F.N.F. has worked full time as a waitress and part time as a drill press operator. She has also obtained a license to work as a phlebotomist. CASA Supervisor Mandy Kennedy testified that termination of F.N.F.'s parental rights to H.L.F. was not CASA's original goal. She explained that because E.H. and B.H. had done such a good job taking care of H.L.F. throughout the case and because of H.L.F.'s young age, CASA changed its recommendation so that E.H. and B.H. could adopt H.L.F. It is implicit from Kennedy's testimony that her recommendation was not based on F.N.F.'s continuing to engage in endangering conduct. Similarly, CPS Supervisor Patricia Skelton confirmed that, if H.L.F. was older, CPS would not be seeking termination of F.N.F.'s parental rights.

### 4. Conclusion

The evidence at trial shows that F.N.F. had engaged in endangering conduct before H.L.F. was born. But the undisputed evidence shows that, once H.L.F. was born, F.N.F. did not continue to engage in a course of conduct that would endanger H.L.F.'s well being. This was confirmed by F.N.F.'s expanded rights to her oldest children, J. and G. The testimony at trial from both CASA and CPS employees confirmed that they did not believe H.L.F. was continuously engaging in endangering conduct upon her release from state jail. After viewing the evidence in the light most favorable to the finding and reviewing the undisputed facts at trial, we conclude that no reasonable trier of fact could form a firm belief or conviction that F.N.F. engaged in a continuous course of conduct or placed H.L.F. with persons who engaged in conduct that endangered H.L.F.'s physical and emotional well being. *See* ***In re J.F.C.***, 96 S.W.3d at 266. Therefore, we hold that the evidence is legally insufficient to terminate F.N.F.'s parental rights pursuant to subsection (E).

## Termination Under Section 161.001(1)(O)

In its third ground for termination of F.N.F.'s parental rights, the jury found that F.N.F. failed to comply with the provisions of a court order signed pursuant to Section 161.001, subsection (1)(O), of the family code.

12

The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child. *See* TEX. FAM. CODE ANN. § 161.001(1)(O) (West Supp. 2012).

When the Department seeks termination under subsection (O), it must prove by clear and convincing evidence that the child was removed for abuse or neglect. *In re A.A.A.*, 265 S.W.3d 507, 515 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). Whether a child was removed for abuse or neglect must be determined on a case by case basis. *Id.* Evidence of abuse or neglect of a sibling does not support termination under subsection (O). *In re E.C.R.*, No. 01-11-00791-CV, 2012 WL 897777, at *4 (Tex. App.—Houston [1st Dist.] Mar. 15, 2012, no pet.). Risk of harm is insufficient to satisfy the abuse or neglect element of subsection (O). *See In re S.A.P.*, 169 S.W.3d 685, 705-06 (Tex. App.—Waco 2005, no pet.).

CPS Investigator Terri Baker testified that when a woman has a child while she is in prison, CPS gets involved if a report is made. According to Baker's testimony, the information she received during her investigation came from the CPS intake report and her supervisor, Patricia Skelton. Baker testified that she did not know F.N.F. wanted S.Y. to take H.L.F. home from the hospital until after H.L.F. had been removed. Baker explained that she knew a "staffing" had been held between supervisors regarding H.L.F. and that the supervisors would have known whether a competent adult was available to take H.L.F. home from the hospital. According to Baker, the intake report did not contain allegations of abuse or neglect of H.L.F., but included only a statement that H.L.F. was born while her mother was incarcerated. As we have previously stated, H.L.F. was born healthy, and did not test positive for controlled substances. The Department offered no evidence that H.L.F. was removed due to abuse or neglect. Instead, the testimony showed that the Department removed H.L.F. because its policy prohibited S.Y. from taking the child.

After viewing the evidence in the light most favorable to the finding and reviewing the undisputed facts, we conclude that no reasonable trier of fact could form a firm belief or conviction that H.L.F. was removed due to abuse or neglect. *See In re J.F.C.*, 96 S.W.3d at 266.

13

Therefore, we hold that the evidence is legally insufficient to terminate F.N.F.'s parental rights pursuant to subsection (O).

**Conclusion**

Because we have held that the evidence is legally insufficient to establish grounds for termination under Sections 161.001(1)(D), (E), and (O), we sustain Appellants' second issue.

**TERMINATION OF A.D.'S PARENTAL RIGHTS**

As part of their third issue, Appellants contend the evidence is legally and factually insufficient to support termination of A.D.'s parental rights to H.L.F. under Section 161.001, subsection (1)(Q) of the family code. Appellants also contend the evidence is legally and factually insufficient to support a finding that termination of A.D.'s parental rights is in H.L.F.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(2).

**Termination Under Section 161.001(1)(Q)**

The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has knowingly engaged in criminal conduct that has resulted in the parent's conviction of an offense, and his confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition. *See* TEX. FAM. CODE § 161.001(1)(Q) (West Supp. 2012). Subsection (Q) applies prospectively. *In re A.V.*, 113 S.W.3d 355, 360 (Tex. 2003). Thus, if a parent is convicted and sentenced to serve at least two years and will be unable to provide for his child during that time, the state may use subsection (Q) to ensure that the child will not be neglected. *Id.* But a two year sentence does not automatically meet subsection (Q)'s two year imprisonment requirement because neither the length of the sentence nor the projected release date is dispositive of when the parent will in fact be released from prison. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Consequently, evidence of the availability of parole is relevant to determine whether the parent will be released within two years. *Id.* at 109. But the mere introduction of parole-related evidence does not prevent a fact finder from forming a firm conviction or belief that the parent will remain incarcerated for at least two years because parole decisions are inherently speculative, and the decision rests entirely within the parole board's discretion. *See id.*

14

Once the Department has established a parent's knowing criminal conduct resulting in his incarceration for more than two years, the burden shifts to the parent to produce some evidence as to how he will arrange care for the child during that period. *Hampton v. Tex. Dep't of Protective & Regulatory Servs.*, 138 S.W.3d 564, 567 (Tex. App.—El Paso 2004, no pet.); *see also In re Caballero*, 53 S.W.3d 391, 396 (Tex. App.—Amarillo 2001, pet. denied). Factors to be considered when deciding whether an incarcerated parent is unable to care for a child include the availability of financial and emotional support. *In re B.M.R.*, 84 S.W.3d 814, 818 (Tex. App.—Houston [1st Dist.] 2002, no pet.). When the parent meets his burden of production, the Department then has the burden of persuasion that the parent's arrangement would not satisfy the parent's duty to the child. *In re Caballero*, 53 S.W.3d at 396.

### 1. Analysis

At trial, A.D. was incarcerated. He testified that he had been convicted of, and imprisoned for, the felony offense of attempted manufacture of a controlled substance. He was released on parole in 2006. While on parole, A.D. committed the felony offense of theft of property, to which he pleaded guilty on March 30, 2011, and received a sentence of twelve years of imprisonment. A.D. explained that he served four and one-half years in prison on the attempted manufacture of a controlled substance offense before he was released on parole for good behavior. A.D. testified that his first parole date for his most recent offense could be at any time "in the next six months," but then acknowledged that this was a discretionary parole date and not guaranteed. A.D.'s testimony revealed that his "mandatory release date" was approximately four years away. He also testified that he had a "blue warrant hold" as a result of committing an offense while on parole. At the time of trial, it was uncertain as to what, if any, effect A.D.'s blue warrant would have in regard to his release date. Thus, A.D.'s own testimony established that he engaged in criminal conduct that resulted in his incarceration for more than two years. Accordingly, A.D. was required to produce some evidence to show how he would provide care for H.L.F. during his period of imprisonment. *See Hampton*, 138 S.W.3d at 567.

A.D. stated that it was in H.L.F.'s best interest to live with F.N.F. He confirmed that he was unable to support H.L.F. while he was in prison, but that he would be able to provide financial support upon his release. A.D. testified that his mother, Marilyn, would provide "all the help [he] need[ed]" to support H.L.F. and explained that his mother is already taking care of

15

his other daughter, "A.D.2.," every other weekend. A.D.2. is approximately four months younger than H.L.F. and is the child of A.D.'s current wife. A.D. testified that A.D.2. did not live with his wife, but lived with his mother-in-law, and that Marilyn took care of A.D.2. every other weekend. A.D. also testified that when Marilyn has A.D.2., she brings the child to the jail for visits and that she sends him pictures of A.D.2. He also testified that he writes letters to A.D.2. from prison.

Marilyn testified that it had been "several months" since she had observed A.D. interact with his children because he has been incarcerated. She testified, however, that before his incarceration, A.D.'s interactions with his children and his nieces and nephews were "good." She did not testify about whether she was willing to provide care for H.L.F. while A.D. is in prison. She testified only that she had not provided any support for H.L.F. prior to trial because she had never had the opportunity to see her.

## 2. Conclusion

After viewing the evidence in the light most favorable to the finding, we conclude that a reasonable fact finder could have formed a firm belief or conviction that A.D. was convicted of the felony offense of theft of property, that he was sentenced to twelve years of imprisonment, and that, due to his previous parole experience, he would not be released from prison in less than two years after the filing of the Department's petition. A reasonable fact finder could have also formed a firm belief or conviction that A.D. would be unable to provide care for H.L.F. during his imprisonment. Despite his testimony that Marilyn would provide "all the help [he] need[ed]," Marilyn never confirmed her willingness and ability to provide care and support for H.L.F. From this evidence, the fact finder could have formed a firm belief or conviction that it was unlikely, despite A.D.'s belief to the contrary, that he would be released before the two year statutory limit, and that he did not have the ability to care for H.L.F. for not less than two years from the date of the Department's filing of its petition.

Although there is some conflicting evidence that A.D. may be released before the two year time period ends and that A.D.'s mother may be willing to provide support for H.L.F., this disputed evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that A.D. knowingly engaged in criminal conduct that resulted in his conviction of an offense and imprisonment and

16

inability to care for H.L.F. for not less than two years from the date of the Department's filing of its petition. Accordingly, we overrule Appellants' third issue as it pertains to the legal and factual sufficiency of the evidence supporting termination of A.D.'s parental rights pursuant to subsection (O).

## Best Interest of the Child

The party seeking termination must prove by clear and convincing evidence that termination of a parent's rights is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(2). Parental rights may not be terminated merely because a child might be better off living elsewhere. *In re C.R.*, 263 S.W.3d at 375. Furthermore, a parent's imprisonment does not automatically establish that termination is in the child's best interest. *In re S.R.L.*, 243 S.W.3d 232, 236 (Tex. App.—Houston [14th Dist.] 2007, no pet.). But a parent's incarceration is a factor that courts may consider in determining the best interest of a child. *See In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). In determining the weight of this factor, the court should consider the expected length of the imprisonment. *See id.* The prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. *See* TEX. FAM. CODE ANN. § 263.307(a) (West 2008). But there is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

In determining the best interest of the child, the courts consider a number of factors including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). The family code also provides a list of factors to consider whether a child's parents are willing and able to provide a child with a safe environment, which we will consider in conjunction with the above-mentioned *Holley* factors. *See* TEX. FAM. CODE ANN. § 263.307. The applicable statutory factors here include (1) the child's age and physical and mental vulnerabilities; (2) whether there is a history of abusive or assaultive conduct by the

17

child's family or others who have access to the child's home; and (3) whether there is a history of substance abuse by the child's family or others who have access to the child's home. *See id.* § 263.307.

The Department need not prove all of the statutory or *Holley* factors to show that termination of parental rights is in the child's best interest. *See Holley*, 544 S.W.2d at 372; *In re J.I.T.P.*, 99 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *In re M.R.J.M.*, 280 S.W.3d 494, 507 (Tex. App.—Fort Worth 2009, no pet.). But the presence of scant evidence relevant to each factor will not support such a finding. *Id.* Evidence supporting termination of parental rights is also probative in determining whether termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28-29.

### 1.    Analysis

H.L.F. was approximately seventeen months old at the time of trial and is too young to express her desires. A.D. had no personal contact with H.L.F. during the pendency of the case, but had received photographs of H.L.F. from F.N.F.'s mother, S.Y. A.D. also did not present evidence of any efforts he made to foster a relationship with H.L.F. while he was incarcerated.[4] This weighs in favor of termination.

A.D. testified that he was currently serving a twelve year prison sentence for felony theft, and had a parole hold for his 2002 second degree felony conviction for the offense of attempted manufacture of a controlled substance. A.D. confirmed that he did not provide any support for F.N.F. while she was pregnant, primarily because when he was not incarcerated, F.N.F. was incarcerated, and when F.N.F. was not incarcerated, A.D. was incarcerated. He also confirmed that he did not provide support for H.L.F. while she was in E.H.'s and B.H.'s care. This weighs in favor of termination.

Although H.L.F. does not have any specialized physical or emotional needs, it is undisputed that A.D. would be unable to care for or support H.L.F. while he was in prison, unless his mother helped him. A.D. testified that it is "hard" to be a father "when you're incarcerated," but said that his mother, Marilyn, would "take [his] place" if necessary. Marilyn

---

[4] We note that CPS never offered a service plan for A.D. in the current case despite his requests.

18

testified during the termination trial, but did not address whether she would provide support for H.L.F. during A.D.'s imprisonment. This weighs in favor of termination.

A.D. testified that he had a commercial driver's license that was valid until 2013, an associate's degree in business management, and a journeyman's license that he obtained in 2005 or 2006. He stated that he was confident in his ability to find employment upon his release from prison, and that he was "one hundred percent" willing and able to use his employment to support H.L.F He stated further that he would do "whatever it takes" to take care of H.L.F. A.D. testified that upon his release from prison, he planned to attend classes to maintain his sobriety from methamphetamine and that he wanted to work up his visitations with H.L.F. from supervised visitation to joint custody. Despite A.D.'s testimony regarding his ability to provide for H.L.F. upon his release from prison, his length of imprisonment was speculative in that the availability of parole was discretionary and all of his plans were contingent upon his release from prison. Thus, this weighs in favor of termination.

Testimony revealed that A.D. began using methamphetamine in 1996, but at the time of trial, had been sober for "almost" two years. A.D. was the father of three children, two of whom had mothers who were methamphetamine addicts. At the time of trial, A.D. was still married to the mother of his youngest child, who had previously obtained an emergency protective order against him. A.D. explained that he found his wife at a known drug house with their child. When he confronted her and attempted to remove the child from the house, an argument ensued and he was arrested for domestic violence. But according to A.D., all charges, including the emergency protective order, were subsequently dismissed. A.D.'s prior arrests for family violence, his methamphetamine addiction, and involvement with women who have a methamphetamine addiction also weigh in favor of termination.

### 2. Conclusion

After viewing the evidence in the light most favorable to the finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of A.D.'s parental rights was in H.L.F.'s best interest.

Although there is some conflicting evidence regarding A.D.'s release and his ability to provide care and support for H.L.F. through his mother while he is in prison, this evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its

19

finding and formed a firm belief or conviction that termination of A.D.'s parental rights was in H.L.F.'s best interest. The evidence is both legally and factually sufficient to terminate A.D.'s parental rights as being in H.L.F.'s best interest. We overrule Appellants' third issue.

<strong>INTERVENOR STANDING</strong>

In their fourth issue, Appellants argue that E.H. and B.H. lacked standing to intervene in the current case.

## Standard of Review and Applicable Law

We review a trial court's ruling on a motion to strike an intervention for abuse of discretion. *In re N.L.G.*, 238 S.W.3d at 829. A trial court abuses its discretion when its decision is arbitrary or unreasonable. *Whitworth v. Whitworth*, 222 S.W.3d 616, 621 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Any party may intervene by filing a pleading, subject to being stricken by the court for sufficient cause on the motion of any party. TEX. R. CIV. P. 60. Generally, an intervenor must show standing to maintain an original suit in order to intervene. *Whitworth*, 222 S.W.3d at 621. But in a suit affecting the parent-child relationship, the intervenor does not need to plead or prove standing to institute an original suit because managing conservatorship is already in issue. *Id.* Section 102.004(b) provides that a court

> may grant a grandparent or other person deemed by the court to have had substantial past contact with the child leave to intervene in a pending suit filed by a person authorized to do so . . . if there is satisfactory proof to the court that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development.

TEX. FAM. CODE ANN. § 102.004(b) (West 2008). The overriding policy in all suits affecting the parent-child relationship is to protect the best interest of the child. *See Whitworth*, 222 S.W.3d at 621. Thus, once the child's best interest is before the court and being litigated, the trial court has discretion to determine that the intervention may enhance the trial court's ability to adjudicate what is in the best interest of the child. *See id.* at 622.

## Analysis

H.L.F. was placed with F.N.F.'s cousin, E.H., and her husband, B.H., on February 15, 2010. On September 17, 2010, E.H. and B.H. filed their petition for intervention, alleging that it

20

was not in H.L.F.'s best interest for either parent to be named as her conservator and sought sole managing conservatorship of H.L.F. H.L.F. continuously lived with E.H. and B.H. throughout the pendency of the case and called them "mama" and "daddy." By the time of trial, H.L.F. had been living with E.H. and B.H. for over one year. F.N.F. had a history of drug abuse and had two other children in the Department's care. Also, H.L.F. had substantial past contact with E.H. and B.H. Therefore, the trial court did not abuse its discretion in denying F.N.F.'s motion to strike the E.H.'s and B.H.'s intervention. We overrule Appellant's fourth issue.

## DISPOSITION

We have sustained the portion of Appellants' second issue pertaining to the legal sufficiency of the evidence to support termination of F.N.F.'s parental rights. Accordingly, we *reverse* the judgment of the trial court as it pertains to F.N.F. and *render* judgment that the Department's request for termination of the parent-child relationship between F.N.F. and H.L.F. is *denied*. Having overruled Appellants' remaining issues, we *affirm* the trial court's judgment in all other respects.[5]

**SAM GRIFFITH**
Justice

Opinion delivered November 30, 2012.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)

---

[5] We do not alter the portion of the judgment regarding conservatorship of H.L.F. Reversal of a trial court's termination judgment does not affect the trial court's conservatorship appointment absent assigned error. *In re J.A.J.*, 243 S.W.3d 611, 613 (Tex. 2007) (reversal of termination judgment does not affect unchallenged conservatorship determination).



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**NOVEMBER 30, 2012**

**NO. 12-11-00243-CV**

**IN THE INTEREST OF H.L.F., A CHILD**

Appeal from the 354th Judicial District Court
of Rains County, Texas. (Tr.Ct.No. 8912)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, because it is the opinion of this court that there was error in the judgment of the court below, it is ORDERED, ADJUDGED and DECREED by this court that the judgment of the trial court terminating the parental rights of F.N.F. is **reversed** and judgment **rendered** that the request of the Department of Family and Protective Services for termination of the parent-child relationship between F.N.F. and H.L.F. is **denied**.

It is the opinion of this court that there was no error in the judgment as it relates to all other matters raised; therefore, it is ORDERED, ADJUDGED and DECREED by this court that the judgment of the trial court terminating the parental rights of A.D. is **affirmed**.

Sam Griffith, Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*